862 A.2d 1119

ROBERT SAGER, PETITIONER–APPELLANT, v. O.A. PETERSON
CONSTRUCTION, CO., RESPONDENT–RESPONDENT.

Argued October 12, 2004—Decided December 21, 2004.

Scott P. Kessler, argued the cause for appellant (Tobin, Koster, Oleckna, Reitman, Greenstein & Konray, attorneys).

Francis T. Giuliano, argued the cause for respondent.

Justice ZAZZALI delivered the opinion of the Court.

On the day of the terrorist attacks in New York City in September of 2001, Robert Sager was working at a construction site on Long Island, New York, for his employer, a New Jersey contractor. Because the attacks caused the emergency closing of all bridges and tunnels between New York and New Jersey, Sager and several co-workers were unable to return to their New Jersey homes at the end of the scheduled workday. Consequently, at the direction of their employer, Sager and his co-workers left the site for an early dinner. When returning from a local eatery to the site, Sager was seriously injured in an automobile accident.

Although the Judge of Workers' Compensation held that Sager's injuries were compensable, the Appellate Division denied his claim. Because we hold that there was substantial credible evidence to support the determination of compensability, we reverse.

## I

Robert Sager was employed for nineteen years as a carpenter with his employer, O.A. Peterson Construction Company (O.A. Peterson), in Montclair, New Jersey. Sager's position with O.A. Peterson required him to report directly to various job sites where the company was a contractor. On September 11, 2001, Sager was working at a Long Island job site, an assignment that began in July 2001. That morning, he met his on-site supervisor, John Devlin, at Devlin's home in Union, New Jersey. Devlin and Sager carpooled to the Long Island job site in Devlin's personal vehicle, which had been their routine for the prior two months. Their ride to and from the site required use of the Goethals Bridge and the Verrazano Bridge. At approximately 7:00 a.m., they arrived at the job site, joined by two other O.A. Peterson employees who also

drove together from their homes in New Jersey. The four employees were scheduled to work at the job site from 7:00 a.m. until 3:30 p.m., with a half-hour lunch break. On that morning, the employees learned of the terrorist attacks shortly after they occurred, at about 9:00 a.m., but the employees continued working. Because of their anxiety about the catastrophic events unfolding just a few miles away, neither Sager nor his co-workers were able to eat during their lunch break.

Due to the abrupt closure of all bridges and tunnels between New York and New Jersey, with no indication as to when they might reopen, the employees were uncertain as to when they would be able to return home. There were no on-site eating facilities and, therefore, Sager and his co-workers left the site at about 3:00 p.m. to have an early dinner. They climbed into a van owned and operated by one of the workers and drove a few miles to a local diner. September 11 was the only day that Sager ever left the site to obtain food at the end of the workday. They finished their meal in about fifteen minutes, and, while driving back to the job site, the van was involved in a head-on collision with another vehicle. Sager suffered femur and knee injuries, and was hospitalized for twelve days.

Subsequently, Sager filed a Claim Petition with the New Jersey Division of Workers' Compensation and a trial was held. John Devlin, the on-site supervisor of the project, testified at trial that it was his decision that everyone leave the site to get something to eat. Devlin testified as follows:

Q: When you went back to the—when you left you testified you were going back to the job site?

A: Yes.

Q: What was your intention?

A: Going back to work.

Q: Going back to work?

A: Yes.

Q: So you were going to continue working past 3:00?

A: Yeah.

Q: Why would you have gone back to work past 3:00?

A: What else would we have done? There was nothing else to do, you know. We were stuck in New York, you know. So I said we will go out, we will have an early dinner, come back to the job. We will keep working. If we hear that they opened up a bridge or tunnel, jump in the cars and get out of here. So that was my decision, you know.

Q: It was your decision as a supervisor?

A: As a supervisor, yes.

Devlin further testified that it was his understanding that when he left the diner, the bridges and tunnels were still closed. As a result, he intended "to take the three men under [him] back to the job site." That is why he informed the employees that, upon their return from the diner, they were to "continue working on the job." Devlin confirmed that when he "advised the other three men of [his] plan . . . [no]body object[ed] to working the overtime." Devlin also indicated that, based on his past experience, if he "needed to work overtime and the people with [him] worked overtime at [his] direction the company would pay them the overtime."

Sager described the decision to leave the job site and get something to eat as follows:

Q: Your normal workday you testified would have concluded at 3:00?

A: About 3:15, 3:30, yes.

Q: Were you prepared to leave at 3:00 or so?

A: If we could get back to New Jersey. At that time we couldn't get back to New Jersey.

Q: How did you know that?

A: We heard that the bridges going in and out were closed. In and out were closed.

Q: So, what would you have normally done if this didn't occur?

A: Leave the normal time and go home.

Q: Did you do something instead of doing that on September 11th?

A: We decided to go out and to get something to eat.

Q: Why did you make that decision?

A: Because we couldn't get back to New Jersey. We wanted to get something to eat. To get something to tie us over and to possibly find a place to sleep.

Sager further testified that, after leaving the diner, but before the collision, they heard on the van's radio that the bridges and tunnels to New Jersey had re-opened. According to Sager, this

development prompted Devlin to ask Sager if he "wanted to head back to New Jersey," to which Sager responded, "yes, let's try to get back home."

David Traub, O.A. Peterson's project manager for the Long Island site, also testified at the trial. Traub stated that, as project manager, he was not at the Long Island job site every day, and that he was not at the site on September 11. Traub also testified that Devlin was in charge of the project when he was not on site, and that Devlin was authorized to allow the employees to work overtime.

After hearing the testimony, the compensation court decided that Sager's claim was compensable. According to the court, the question presented was whether Sager's injury occurred when he was engaged in the direct performance of duties assigned or directed by the employer. The court found that Devlin had decided that the employees would leave the site to get something to eat and then return to the job site. It also found that Devlin made it clear that he was the on-site supervisor, had authority to decide how many hours the crew would work, and expected that the workers would be paid for the overtime work he authorized. Relying on those findings, the court held that Sager's injuries were compensable because he was on a "special mission" at the time of the accident. It stated:

> As indicated earlier, the testimony of Mr. Devlin, the on-site Supervisor, was that it was his decision to take the workers to get some food, and to return to the job site. He had the authority to do this. He thus controlled the activities of those workers working under his supervision.

In an unpublished per curiam opinion, the Appellate Division reversed, holding that the case was not compensable because Sager, when injured, was neither required by his employer to be away from his place of employment nor engaged in the direct performance of his employment duties. We granted Sager's Petition for Certification. *Sager v. O.A. Peterson Constr. Co.*, 179 *N.J.* 313, 845 *A.*2d 137 (2004).

## II

The Workers' Compensation Act (Act) states:

When employer and employee shall by agreement ... accept the provisions of this article[,] compensation for personal injuries to ... such employee by accident *arising out of and in the course of employment* shall be made by the employer without regard to the negligence of the employer, according to the schedule contained in [the] sections ... of this Title....

[*N.J.S.A.* 34:15-7 (emphasis added).]

The Legislature amended the Act in 1979 to provide that employment commences when

an employee arrives at the employer's place of employment to report for work and shall terminate when the employee leaves the employer's place of employment, excluding areas not under the control of the employer; provided, however, when the employee is required by the employer to be away from the employer's place of employment, the employee shall be deemed to be in the course of employment when the employee is engaged in the direct performance of duties assigned or directed by the employer....

[*N.J.S.A.* 34:15-36.]

We recently set forth the decisional precedent prior to the 1979 amendment, the purpose of the amendment, and the development of the law since its enactment. *Lozano v. Frank DeLuca Constr.*, 178 *N.J.* 513, 522-31, 842 *A.*2d 156, 161-66 (2004); *see also Jumpp v. City of Ventnor*, 177 *N.J.* 470, 476-83, 828 *A.*2d 905, 908-913 (2003). As we explained, our courts and Legislature have established principles that seek to fairly distinguish between compensable and non-compensable injuries.

In *Lozano, supra,* an employee was injured when he crashed a go-cart while on a job site of his employer, a mason contractor. 178 *N.J.* at 519, 842 *A.*2d at 159-60. Lozano claimed that he drove the go-cart because his employer ordered him to do so. *Ibid.* The Division of Workers' Compensation and the Appellate Division denied benefits to Lozano, holding that he failed to satisfy the statutory test applicable to recreational and social activities, *N.J.S.A.* 34:15-7. *Id.* at 520, 842 *A.*2d at 160. We reversed, reasoning as follows:

Our reading of the legislative history persuades us that the 1979 amendments were not designed to overrule those earlier cases finding that *compulsion, stand-*

*ing alone, brings an activity that is otherwise unrelated to work within the scope of employment. . . .*

. . . .

A contrary reading of *N.J.S.A.* 34:15-7 would impose on employees a classic Hobson's choice: obey the employer's order and jeopardize eligibility for workers' compensation benefits, or refuse to engage in the required activity and risk loss of employment. We do not believe the Legislature intended such a result. That construction of the statute does violence to the long-standing recognition that the act "is humane social legislation designed to place the cost of work-connected injury on the employer who may readily provide for it as an operating expense." [*Id.* at 532-33, 842 *A.*2d at 167 (quoting *Hornyak v. Great Atl. & Pac. Tea Co.,* 63 *N.J.* 99, 101, 305 *A.*2d 65, 66 (1973)) (emphasis added).]

We concluded, therefore, that "when an employer compels an employee's participation in an activity generally viewed as recreational or social in nature, the employer thereby renders that activity work-related as a matter of law." *Id.* at 518, 842 *A.*2d at 159.

█ In this matter, the Appellate Division did not have the benefit of our holding in *Lozano* when it rendered its decision. Thus, we take this opportunity to reaffirm the principle that when an employer directs or requires an employee to undertake an activity, "that compulsion, standing alone, brings an activity that is otherwise unrelated to work within the scope of employment." *Id.* at 532, 842 *A.*2d at 167. Because we apply that straightforward rationale in this appeal, there is no need to consider the compensation court's "special mission" reasoning. We also decline Sager's invitation to adopt a "special emergency" theory, although the events of September 11 do provide context for our conclusion.

The question we now must answer is whether the compensation court correctly determined that the employer directed Sager to perform the activity at issue.

III

A.

█ The standard of appellate review in a workers' compensation case is limited to

whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge of their credibility and, in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor.

[*Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.2d* 753, 758 (1965) (citation and internal quotation marks omitted).]

An appellate court may not "engage in an independent assessment of the evidence as if it were the court of first instance." *State v. Locurto*, 157 *N.J.* 463, 471, 724 *A.2d* 234, 239 (1999). Findings of fact made by a trial judge "are considered binding on appeal when supported by adequate, substantial and credible evidence." *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.2d* 495, 500 (1974). Accordingly, if in reviewing an agency decision, an appellate court finds sufficient credible evidence in the record to support the agency's conclusions, that court must uphold those findings, even if the court believes that it would have reached a different result. *In re Taylor*, 158 *N.J.* 644, 657, 731 *A.2d* 35, 42 (1999) (citing *Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 588, 538 *A.2d* 794, 800–01 (1988); *Goodman v. London Metals Exch., Inc.*, 86 *N.J.* 19, 28–29, 429 *A.2d* 341, 346 (1981)).

## B.

▉ In response to questions regarding his decision to work overtime, Devlin, the on-site supervisor, testified:

A: What else would we have done? There was nothing else to do, you know. We were stuck in New York, you know. *So I said we will go out, we will have an early dinner, come back to the job. We will keep working.* If we hear that they opened up a bridge or tunnel, jump in the cars and get out of here. *So that was my decision,* you know.

[(Emphasis added).]

Devlin's testimony, standing alone, constitutes sufficient credible evidence to support the compensation court's conclusions. The Judge of Workers' Compensation reasonably found that Devlin, in response to the emergent situation, devised a supervisory plan in order that he and his subordinates could obtain something to eat, return to the job site, and work overtime until they were able to go home. It is immaterial that Devlin's directive to Sager and the

other employees involved participation in what is generally considered a social activity. We have "recognize[d] that an employer always retains the power to expand the scope of employment by directing the employee to engage in tasks outside of the employee's general job duties." *Lozano, supra,* 178 *N.J.* at 531, 842 *A.*2d at 167. Stated simply, Sager's injuries are compensable because Devlin's credible testimony supports the conclusion that Sager was acting under the direction of his employer when the automobile accident occurred.

Additional evidence tends to corroborate the compensation court's finding that Devlin's plan was a directive. Neither Sager nor the other two O.A. Peterson employees objected to Devlin's overtime plan. Presumably, they were well aware, from past experience, that Devlin was authorized to extend their scheduled workday. They followed their supervisor's order and went with him to the diner so they could quickly eat and then continue working. Moreover, Devlin's control over Sager was such that if Devlin was going to continue working, Sager had to also continue working. For nearly two months the two men had been commuting together in Devlin's personal vehicle; Sager both went to work and left from work when Devlin decided to do so. This ancillary evidence, although not dispositive, strengthens the conclusion that Sager and the other two employees reasonably construed Devlin's words as a directive.

To be sure, parts of the trial testimony suggest, perhaps, that Sager did not consider Devlin to have issued a directive. For example, Sager testified that the employees collectively "decided to go out and to get something to eat." Sager also testified that, after leaving the diner, but before the collision, he and Devlin discussed the possibility of going home because they had learned that the bridges and tunnels back to New Jersey had been reopened. But those comments do not affect the calculus in this appeal, in view of the compensation court's dispositive and unequivocal findings that it was Devlin who "controlled" the employees and who made the "decision" to go to dinner. Even the

Appellate Division conceded that "Devlin, the on-site supervisor, *decided that he and his co-workers would leave the job site* to get something to eat while they were waiting for the bridges and the tunnels to New Jersey to reopen." (Emphasis added). Both the compensation and appellate courts thus recognized that Devlin, as on-site supervisor, was the decision-maker in the group, not Sager or any other employee.

Although the Appellate Division acknowledged that it was Devlin's decision to leave the site, the panel added:

> We do not consider Devlin's decision to have been a requirement that petitioner leave his place of employment. The *reality of the situation* was that petitioner and his co-workers *voluntarily* decided to leave to get something to eat because they did not know how long it would be before they would be able to return to their homes in New Jersey. That Devlin, petitioner's supervisor, made the decision to go, does not mean that petitioner was obligated to go. *Undoubtedly, he could have stayed at the job site, should he have chosen to do so, without exposing himself to an adverse employment action.*
> [(Emphasis added).]

The gloss that "the reality of the situation" was that Sager "voluntarily" decided to leave fails on two counts. The panel's effort both to divine Sager's mental state and to define the "reality" of the situation on September 11, in the context of that horrific day, is speculative. Moreover, such findings are for the compensation court, not an appellate panel. The compensation court had the opportunity to evaluate the credibility and demeanor of the employees involved. It heard, first-hand, the testimony of supervisor Devlin and was in the best position to determine credibility and to make findings of fact.

The panel also dismissed the possibility that Sager could have suffered a potential adverse action if he had refused to accompany his boss to the diner. The court said that Sager was not "obligated" to go, and that an adverse action "undoubtedly" would not have resulted. But many, perhaps most, employees experience situations where they feel obligated to comply with their supervisor's request, regardless of its nature. They usually comply with the request, rather than damage that relationship. We recognize that in many cases the supervisor's reaction to an employee's

refusal may not be adverse. Yet, as noted, most employees comply with their supervisors' requests or orders and are expected to do so.

Our conclusion here does not conflict with *Jumpp*. In *Jumpp, supra*, the Court denied coverage to a city employee who was injured when he deviated from his assigned duties to pick up his personal mail at the local post office. 177 *N.J.* at 475–76, 828 *A.*2d at 907–08. Because the employee was on a personal errand, and because that analysis centered on the "minor deviation" rule, we distinguish *Jumpp* from this matter. Indeed, the holding in this appeal comports with our conclusion in *Jumpp, supra,* that "[e]mployees who are where they are supposed to be, doing what they are supposed to be doing, are within the course of employment whether on- or off-premises...." *Id.* at 483, 828 *A.*2d at 912.

## C.

Finally, in *Lozano,* we held that an "employee must demonstrate an objectively reasonable basis in fact for believing that the employer had compelled participation in the activity." *Lozano, supra,* 178 *N.J.* at 534, 842 *A.*2d at 168. Further, "[w]hether the employee's belief is objectively reasonable will depend largely on the employer's conduct and must be assessed on a case-by-case basis." *Ibid.* The dissent argues that because the compensation court did not apply the "reasonable belief" test to Sager in this matter, we should remand this appeal for further proceedings. *Post* 182 *N.J.* at 173, 862 *A.*2d at 1129.

Although the compensation court did not have the benefit of *Lozano,* its holding is nonetheless consistent with *Lozano.* There, we held that an employer's directive to an employee to undertake an activity brings that activity within the scope of employment. The compensation court's opinion in this appeal presaged *Lozano,* finding the employees' trip to the diner was within the scope of their employment because Devlin "controlled the activities" of the workers and made the "decision" to have a meal.

Consequently, we do not require a remand to obtain proof of Sager's reasonable belief in the circumstances of this case. When an employer acknowledges its directive, as here, and when a compensation court credits the employer's testimony, as here, we will not require the employee to produce additional proof. Devlin's express and clear testimony was that he made the decision that the employees would undertake an activity. Crediting that testimony, the compensation court stated that "the testimony of Mr. Devlin, the on-site Supervisor, was that it was his decision to take the workers to get some food, and to return to the job site. He had the authority to do this. He thus controlled the activities of those workers working under his supervision."

Moreover, Sager has consistently maintained in this litigation, and the compensation and appellate courts found, that it was the employer who made the decision that the employees should go to the diner. The fact that Sager's testimony may appear equivocal does not detract from Devlin's testimony that Devlin made that decision. Because there is adequate and credible evidence to support the compensation court's finding that Devlin issued a directive, a remand is unnecessary.[1]

---

[1] The dissent also notes that the trial court did not consider whether Devlin had filed for workers' compensation benefits when it assessed Devlin's credibility. *Post* 182 *N.J.* at 173, 862 *A.*2d at 1129. To be sure, the employer's counsel asked Sager whether Devlin had filed for benefits. Although Sager's answer may appear ambiguous, it suggests that Devlin was, in fact, receiving benefits. At that point, the employer's attorney had the opportunity to clarify whether Devlin was receiving benefits, but the attorney never did so. Additionally, and far more important, when Devlin himself was on the stand, the employer's attorney failed to ask him whether he had sought or received benefits. Those oversights, however, do not warrant a remand. If counsel's omissions were intended, we will not second-guess his decisions. If the omissions were inadvertent, we will not remand simply to allow counsel to reformulate his trial strategy. Furthermore, even if we were to assume the employer proved that Sager's testimony is a basis for concluding that Devlin made a claim for benefits, the compensation court credited Devlin's testimony. We may presume that the court, in evaluating the testimony of witnesses, took Devlin's possible bias into consideration when it reviewed the testimony in this case.

## IV

For almost one hundred years, under the Workers' Compensation Act, our State has afforded protection to and for workers injured at the workplace. The Act is but one part of a statutory, decisional, and constitutional mosaic that provides dignity for all of our citizens in the workplace, but it is a significant piece nonetheless. Courts may parse testimony and refine tests, as we have done here. But, as we do, we must remain mindful that this "humane social legislation," *Hornyak, supra,* 63 *N.J.* at 101, 305 *A.*2d at 66, must be liberally construed "in order that its beneficent purposes may be accomplished." *Torres v. Trenton Times Newspaper,* 64 *N.J.* 458, 461, 317 *A.*2d 361, 362 (1974); *see also Fiore v. Consol. Freightways,* 140 *N.J.* 452, 465, 659 *A.*2d 436, 442 (1995).

## V

For the foregoing reasons, we reverse the judgment of the Appellate Division and reinstate the Division of Workers' Compensation's award of benefits.

Justice WALLACE, dissenting.

I respectfully dissent.

Some brief background is helpful. The original Workers' Compensation Act allowed for compensation when an employee was injured or killed in an accident "arising out of and in the course of employment." *L.* 1911, *c.* 95 § 7, now codified at *N.J.S.A.* 34:15-7. The Act did not contain a definition of employment. As a result, our courts developed principles to distinguish between "those accidental injuries[,] which may fairly be said to have some work connection and those[,] which may fairly be said to be unrelated to the employment." *Hornyak v. Great Atl. & Pac. Tea Co.,* 63 *N.J.* 99, 102, 305 *A.*2d 65, 66 (1973).

To assist in distinguishing between compensable and noncompensable incidents, which occur off the premises, the courts devel-

oped the "going and coming" rule. That rule ordinarily precluded an award of compensation benefits for "injuries sustained during routine travel to and from an employee's regular place of work." *Watson v. Nassau Inn,* 74 *N.J.* 155, 158, 376 *A.*2d 1215, 1217 (1977). Further, an employee who had not yet arrived on the employer's premises, or who had departed the premises at the conclusion of a scheduled work period, was not deemed to be in the course of employment for the purposes of *N.J.S.A.* 34:15–7. *Livingstone v. Abraham & Straus, Inc.,* 111 *N.J.* 89, 96, 543 *A.*2d 45, 49 (1988).

Gradually, "the basic going and coming rule ... became diluted by a series of exceptions." *Ibid.* Those exceptions were so numerous that they "overshadowed" the basic rule. *Watson, supra,* 74 *N.J.* at 159, 376 *A.*2d at 1218.

To provide relief from the numerous exceptions to the "going and coming" rule that had evolved, while at the same time allowing for increased awards for more seriously injured and disabled workers, in 1979, the Legislature amended the Workers' Compensation Act in several respects. Those amendments were designed to "provid[e] genuine reform and meaningful cost containment for New Jersey employers from unjustified workers' compensation costs that [in the late 1970's were] among the highest in the nation." N.J. Senate Labor, Industry and Professions Committee, *Joint Statement to Substitute for S. 802 & A. 840* (Nov. 13, 1979). The primary goals of the legislation "were to eliminate awards for minor partial disabilities, to increase awards for the more seriously disabled, and to contain the overall cost of workers' compensation." *Ibid.*

The current legislation contains a specific definition of employment. *L.* 1979, *c.* 283, § 12, which is now codified at *N.J.S.A.* 34:15–36. That statute provides that employment shall be deemed to commence when

an employee arrives at the employer's place of employment to report for work and shall terminate when the employee leaves the employer's place of employment, excluding areas not under the control of the employer; provided, however, *when the employee is required by the employer to be away from the employer's place of*

employment, the employee shall be deemed to be in the course of employment when the employee is engaged in the direct performance of duties assigned or directed by the employer; but the employment of employee paid travel time by an employer for time spent traveling to and from a job site or of any employee who utilizes an employer authorized vehicle shall commence and terminate with the time spent traveling to and from a job site or the authorized operation of a vehicle on business authorized by the employer. Travel by a policeman, fireman, or a member of a first aid or rescue squad, in responding to and returning from an emergency, shall be deemed to be in the course of employment.

[N.J.S.A. 34:15-36 (emphasis added).]

In *Zelasko v. Refrigerated Food Exp.*, we noted that the Chief Judge of Compensation had written an article shortly after the 1979 amendment to the Act expressing "that compensation for off-premises accidents was 'sharply curtailed' by the new definition of employment." 128 *N.J.* 329, 335, 608 *A.*2d 231, 234 (1992) (citing Alfred J. Napier, *Impact of the Reform Act of 1980*, 96 N.J. Lawyer 17, 18 (August 1981)). We recognized that Judge Napier

specifically construed *N.J.S.A.* 34:15-36 'to remove from compensability certain cases heretofore held compensable where special hazards existed en route to the employer's premises, [and] off-premises injuries sustained during lunch hour.' However, he warned that the 'basic pattern and objectives of our Workers' Compensation Act remain unchanged.'

[*Ibid.* (citations omitted).]

In *Jumpp v. City of Ventnor*, we emphasized that the 1979 amendments for the first time defined on-premises and off-premises employment and that in *Ward v. Davidowitz*, 191 *N.J.Super.* 518, 468 *A.*2d 250 (App.Div.1983), our Appellate Division held that "off-premises 'lunch break accidents' are no longer compensable 'as a matter of law.'" 177 *N.J.* 470, 480, 828 *A.*2d 905, 911 (2003) (quoting *Ward, supra*, 191 *N.J.Super.* at 524, 468 *A.*2d at 253). We rejected workers' compensation benefits to a plaintiff where his job required him to travel throughout the city to inspect various facilities and he was injured when he fell returning to his vehicle from a purely personal trip because the plaintiff was not "performing his [ ] prescribed job duties at the time of injury." *Jumpp, supra*, 177 *N.J.* at 482, 828 *A.*2d at 912.

More recently, in *Lozano v. Frank DeLuca Const.*, we held that "when an employee establishes that his or her employer required

participation in an activity of a recreational or social nature, courts should consider the activity as they would any other compensable work-related assignment." 178 *N.J.* 513, 533, 842 *A.*2d 156, 168 (2004). To recover under that theory, which provides compensation for a required activity that was not part of a work-related assignment, we concluded that "the injured employee must establish that he or she engaged in the activity based on an objectively reasonable belief that participation was required." *Id.* at 518, 842 *A.*2d at 159.

*Lozano* was decided after the Appellate Division here rejected plaintiff's claim for workers' compensation benefits. Nonetheless, the panel correctly focused on the issue of whether plaintiff was required to leave his place of employment. The panel concluded that "[t]he reality of the situation was that petitioner and his co-workers voluntarily decided to leave to get something to eat because they did not know how long it would be before they would be able to return to their homes in New Jersey, [and] [t]hat Delvin, petitioner's supervisor, made the decision to go, does not mean that petitioner was obligated to go." *Sager v. O.A. Peterson Constr. Co.,* No A–67–24–01T2, (App.Div. Oct. 30, 2003) (slip op. at 7). The panel viewed petitioner's "situation akin to a lunch-break type accident, which is no longer compensable since the passage of the 1979 amendments to the workers' compensation laws." *Id.* at 8 (citing *Ward, supra,* 191 *N.J.Super.* at 523, 468 *A.*2d at 252–53).

The majority decision criticizes the panel for being speculative and contrary to the credibility determination of the compensation court. I disagree.

The Compensation judge never made a finding that petitioner had an "objectively reasonable belief" that he was required to go to dinner with his supervisor. *See Lozano, supra,* 178 *N.J.* at 518, 842 *A.*2d at 159. The judge merely used Devlin's testimony that it was his decision to take the workers to get some food to conclude that the dinner trip qualified as a "special mission." The judge failed to discuss petitioner's testimony that the workers jointly

decided to go to dinner. Moreover, because we had not yet decided *Lozano*, the Compensation judge was unaware of the necessity to decide whether petitioner had an objectively reasonable belief that participation in the trip for dinner was required.

The mere fact that the supervisor [1] testified that he said "we will go out, we will have an early dinner, come back to the job," is not dispositive of the issue. In the first place, it is difficult to conclude that the supervisor was ordering the men to go to dinner as opposed to merely suggesting a reasonable solution to address their inability to return home at the end of the workday. It is just as likely the supervisor used the word "will" to mean "let's go" to dinner as opposed to a command that the workers must attend dinner. In any event, the touchstone here is the objective reasonable belief of the worker. Petitioner never testified that he believed he was required to go to dinner with the other men. In fact, it was his testimony that it was a group decision to go to dinner.

In sum, unlike the majority, I cannot conclude that the supervisor's comment was a directive. In my view, petitioner's testimony differed from his supervisor's and the Compensation judge failed to address that potential conflict in the evidence. In light of the Compensation judge's failure to apply the "reasonable belief standard" to petitioner's decision to go to dinner, I would remand the case for further proceedings.

Justice RIVERA–SOTO joins in this opinion.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI and ALBIN—5.

*For remandment*—Justices WALLACE and RIVERA–SOTO—2.

---

[1] The record discloses that at the hearing on February 8, 2000, petitioner testified that Supervisor Devlin also filed for workers' compensation benefits. However, when Devlin testified on May 3, 2002, he was not asked whether he filed such a claim. In any event, the Compensation judge failed to address this factor in assessing Devlin's credibility.