863 A.2d 1123 (2005)
374 N.J. Super. 223
Jose VALDEZ, Petitioner-Appellant,
v.
TRI-STATE FURNITURE, Respondent-Respondent, and
Federated Department Stores, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted November 9, 2004.
Decided January 12, 2005.
*1125 Frank A. Tobias, Woodbridge, for petitioner-appellant (David Kaplan, Neptune, on the brief).
Edward Hoagland, Somerset, for respondent, Tri-State Furniture (Jurij W. Ratych, New Brunswick, on the brief).
Capehart & Scatchard, Mt. Laurel, for respondent, Federated Department Stores (Anne Hammill, on the brief).
Before Judges SKILLMAN, PARRILLO and GRALL.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Petitioner, Christopher (Jose) Valdez, appeals from an order of the Division of Workers' Compensation that dismissed with prejudice his claim for workman's compensation. In dismissing the claim, the judge held that petitioner failed to prove his injury arose out of and in the course of his employment. Because we find the requisite causal connection between petitioner's injury and employment, we reverse the determination below.
The pertinent facts are as follows. Petitioner began working for respondent, Tri-State Furniture (Tri-State), approximately three months prior to the September 23, 2000 accident that resulted in the subject injury. He was employed primarily as a "wrapper," and his job duties in this capacity included uncrating, unwrapping, repairing, and re-wrapping furniture. As a wrapper, petitioner was not required to operate a forklift.
At the time of the accident, Tri-State was under contract with Federated Department Stores (Federated) to repair and service furniture, which was sold in Federated's department stores. Tri-State, Federated, and a third company, R and M Retail and Manufacturers (R & M), all had *1126 their own workspace within the same warehouse. The warehouse was about 300,000 square feet. Tri-State occupied 10,000 square feet in the front, center area of the building. Its workspace was partly divided from the rest of the building by a firewall, but the warehouse was largely open space. Several forklifts, parked approximately 250 feet away from Tri-State's area, were used primarily by Federated and R & M employees to pick up supplies and carts. These forklifts were not used for moving furniture. Instead, furniture was picked up at the back of the warehouse by machines known as cherry-pickers, which were not operated by Tri-State employees, placed on furniture racks, and eventually transported into Tri-State's area through a pulley system.
On Saturday, September 23, 2000, petitioner was working overtime, helping Tri-State's supervisor of major repairs, Ronnie Montero, construct an office within Tri-State's work space. Petitioner had been working overtime with Montero, his immediate supervisor, for several days, and by that Saturday, the office was nearly 50 percent completed. That particular day, petitioner arrived for work at his normal hour, six or seven a.m., and began performing his regular job duties. In the middle of the day, he joined Montero to work on the office. Their specific tasks included hanging sheetrock on the inside of the office, making holes for the windows, and routing the running wires. Most of the sheetrock was located within feet of the office, but an additional supply was located 150 meters away. George Martinez, the operations manager, wanted Montero and petitioner to finish the work quickly. By 3:30 that afternoon, Montero and petitioner were the only two Tri-State employees left in the warehouse. Even Martinez had left. By four p.m., the warehouse was shut down, leaving only petitioner, Montero, and a few maintenance workers.
Petitioner and Montero continued to work on the office until about six p.m., at which point the interior of the office was 95 percent completed. Around that same time, before clocking out for the day, Montero and petitioner decided to operate the forklifts, which were controlled by Federated and parked in Federated's area. Neither was licensed to operate the equipment, nor had they ever done so. Over the next few minutes, as captured by a surveillance camera, Montero and petitioner each drove a forklift around the warehouse but never approached the office or entered Tri-State's area. In fact, the video showed them driving the forklifts in an unorthodox manner at the opposite end of the warehouse. When petitioner realized that he was not able to operate the forks or fully control the levers, he attempted to park the forklift. In the process, the forklift tipped over and crushed petitioner's leg, which had to be amputated. The accident occurred outside of Tri-State's designated area.
According to Martinez, the operations manager, Tri-State employees were all informed of an unwritten policy prohibiting them from operating the forklifts, although at least one employee, Bill Stuber, was authorized to operate the forklifts and, on occasion, used them to transport supplies to and from Tri-State's area. Another unwritten policy supposedly barred Tri-State employees from venturing outside their employer's designated area, but apparently no penalty was ever imposed for violating the ban. Moreover, Martinez never filed an incident report concerning petitioner's forklift accident.
The circumstances and reasons underlying petitioner's and Montero's use of the forklift on September 23 were somewhat in dispute. Petitioner said he decided to use the forklifts in order to move the sheetrock, and because he thought he would be *1127 more useful if he knew how to operate the equipment. Both he and Montero chose to initially drive away from the office because there was more room for them to maneuver and familiarize themselves with the controls on the other side of the warehouse. Petitioner thought that eventually the forklifts would be helpful in moving the sheetrock piled right outside the office, to make more room for the exterior work they still had to finish, and in transporting the additional sheetrock piled further away. Although he had not previously driven a forklift and did not know how to do so, petitioner denied ever being told not to operate the forklifts, had heard about other employees using them, and actually saw another Tri-State employee named Ramon on the equipment earlier that day.
Montero corroborated much of petitioner's account. Although Montero was not sure whether they needed more sheetrock than that already piled outside the office, he said they decided to try operating the forklifts because the equipment would be helpful if additional sheetrock had to be moved closer. Because they were under pressure to get the office finished quickly, both he and petitioner were planning to come back the next day to finish the work, which would require more sheetrock. Like petitioner, Montero was never told not to operate the forklifts but had not seen a Tri-State employee using one until that morning, when he saw Ramon on one. Yet a third Tri-State employee, Angel Mejia, indicated that, in the past, he had been instructed to move furniture and supplies with the forklifts, even though he had not been trained to operate them. He too had seen Ramon and other Tri-State employees operating the forklifts.
The judge rejected the explanation that the forklifts were intended to move sheetrock to finish the construction. She concluded instead, from petitioner's own admission that he wanted to learn how to drive the forklift to make him more valuable, that when the accident occurred, petitioner had abandoned his job to satisfy a purely personal interest, namely, to "experiment with a vehicle he was forbidden to use during his regular hours of employment." Specifically, the court found that petitioner had "deliberately and substantially stepped out of his job" and was engaged in an activity "completely unrelated to the job" in an area "away from the site of his employment" on equipment "not owned by or within the control of the respondent," when the forklift he was driving tipped over and crushed his leg. In a supplemental decision following the Supreme Court's then recent holding in Jumpp v. City of Ventnor, 177 N.J. 470, 828 A.2d 905 (2003), the judge reaffirmed her initial determination that petitioner's injury was not the result of a minor deviation from his job responsibilities, but rather an intentional and substantial abandonment of his work. This appeal follows.
As a threshold matter, we note that appellate review of a judge or agency's fact-finding is limited. Zahner v. Pathmark Stores, Inc., 321 N.J.Super. 471, 476, 729 A.2d 478, 481 (App.Div.1999). We decide whether the findings made could reasonably have been reached from the credible evidence in the record. Ibid. Deference should be given to those findings of the trial judge that are substantially influenced by his or her opportunity to hear and see witnesses and to have the feel of the case. Ibid. However, "a trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Ibid. (quoting Manalapan Realty v. Manalapan Tp. Committee, 140 N.J. 366, 378, 658 A.2d 1230, 1237 (1995)).
On this score, we mention some well-settled governing principles. The New Jersey Workmen's Compensation *1128 Act, N.J.S.A. 34:15-1 to -142, is "humane social legislation designed to place the cost of work-connected injury on the employer who may readily provide for it as an operating expense." Livingstone v. Abraham & Straus, Inc., 111 N.J. 89, 94-95, 543 A.2d 45, 48 (1988) (quoting Hornyak v. The Great Atl. & Pac. Tea Co., 63 N.J. 99, 101, 305 A.2d 65, 66 (1973)). It is axiomatic that provisions of the Act are construed and applied in light of this broad remedial objective. Livingstone, supra, 111 N.J. at 95, 543 A.2d at 48; see also Sager v. O.A. Peterson Construction Co., 182 N.J. 156, 169, 862 A.2d 1119, 1127 (2004). In fact, the Act is liberally construed in favor of employees to further its beneficent purpose. Ibid. Zahner, supra, 321 N.J.Super. at 477, 729 A.2d at 481.
A claimant for workman's compensation must demonstrate both that he sustained an injury "in the course of employment" and that the injury "arose out of" his employment. N.J.S.A. 34:15-1. The "arising out of" portion refers to causal origin, and the "course of employment" portion refers to the time, place, and circumstances of the accident in relation to the employment. Coleman v. Cycle Transformer Corp., 105 N.J. 285, 288, 520 A.2d 1341, 1343 (1986); Zahner, supra, 321 N.J.Super. at 480-81, 729 A.2d at 483-84 (App.Div.1999).

A.
Our courts take a "flexible" approach to questions concerning "in the course of employment" issues. Livingstone, supra, 111 N.J. at 104, 543 A.2d at 53. An employee need not actually be working in order to meet this test. Coleman, supra, 105 N.J. at 289, 520 A.2d at 1343 (quoting Mikkelsen v. N.L. Indus., 72 N.J. 209, 212, 370 A.2d 5, 7 (1977)). Generally, if an employee sustains an injury in an area controlled by the employer his injury is deemed to occur "in the course of employment." See Livingstone, supra, 111 N.J. at 103, 543 A.2d at 53; Coleman, supra, 105 N.J. at 289, 520 A.2d at 1343; Zahner, supra, 321 N.J.Super. at 480-81, 729 A.2d at 483-84. On the other hand, accidents occurring outside areas controlled by the employer are typically not compensable. Brower v. ICT Group, 164 N.J. 367, 371-72, 753 A.2d 1045, 1047-48 (2000); N.J.S.A. 34:15-36.
The meaning of "control" under the Act is more expansive than under formal property law concepts. Brower, supra, 164 N.J. at 372, 753 A.2d at 1048; Livingstone, supra, 111 N.J. at 105, 543 A.2d at 54; Ramos v. M & F Fashions, Inc., 154 N.J. 583, 592, 713 A.2d 486, 490-91 (1998); Ehrlich v. Strawbridge & Clothier, 260 N.J.Super. 89, 92, 615 A.2d 286, 288 (1992), certif. denied, 133 N.J. 435, 627 A.2d 1141 (1993). The phrase in N.J.S.A. 34:15-36 excluding areas not under the employer's control from coverage "does not relate to concepts of exclusive control or duties of maintenance ... but, rather, implies only use by the employer in the conduct of his business." Ramos, supra, 154 N.J. at 593, 713 A.2d at 491 (quoting Cressey v. Campus Chefs, Div. of CVI Serv., Inc., 204 N.J.Super. 337, 343, 498 A.2d 1274, 1277 (App.Div.1985)). Moreover, when compensability of an accident depends on control of the employer, that test is satisfied if the employer has a right to control; it is not necessary to establish that the employer actually exercised that right. Brower, supra, 164 N.J. at 373, 753 A.2d at 1048. The foregoing principles are consistent with the social policy of liberally construing the Act to implement the legislative policy of affording coverage to as many workers as possible. Ibid.
For example, in Cressey, supra, the petitioner was injured when she fell trying to step down from a loading dock to a retaining wall, and we found the accident to have *1129 occurred in the course of her employment. 204 N.J.Super. at 340-43, 498 A.2d at 1275-77. We explained:
Though it did not have exclusive use of the dock, respondent used it for the delivery and unloading of food products, as a place from which to deposit trash refuse into receptacles located on the ramp, for the storage of soda canisters, for the cleaning and storage of tray racks and the cleaning or steam cleaning of utensils and other items.
[Id. at 343, 498 A.2d at 1277.]
Likewise, in Ramos, supra, the claimant fell down an elevator shaft, which was used by several different companies, before his work day even started. 154 N.J. at 588, 713 A.2d at 489. Although most employees did not use the elevator for ingress or egress, it was used to transport fabric and clothing used in the employer's business. Id. at 592, 713 A.2d at 491. Accordingly, the Court found that the claimant was injured "in the course of employment," stating "[c]ontrol in this context imports the notion of the capacity, ability or power to occupy, possess or use. There is no suggestion that control for one purpose does not authorize control for other purposes. Rather, when an employer uses a common area for business purposes, the common area is, by virtue of that use, subject to the employer's control ..." Id. at 592-93, 713 A.2d at 491. Further, the Court emphasized that control is not "a temporal concept" and continues until the employer ceases to use the site. Id. at 593, 713 A.2d at 491.
Here, respondent does not directly refute petitioner's claim that he was injured "in the course of" his employment, other than to point out that the accident occurred outside of Tri-State's designated area and that the forklifts were primarily used by Federated and R.M. However, petitioner was indisputably "on the clock" and in the company of his immediate supervisor when he was injured. Moreover, even accepting the judge's credibility findings, Tri-State itself, through Martinez, its operations manager, admitted occasional use of the forklifts. Martinez acknowledged that another of Tri-State's employees, Bill Stuber, was authorized to use the forklifts to transport supplies to and from the employer's designated area. And, employees of other businesses on the premises also used the forklifts to deliver supplies and materials to Tri-State's designated area.
Of course, not only did Tri-State use the equipment in the course of its business, but it generally used the whole warehouse for storage and delivery of furniture. In this regard, Martinez testified that Tri-State stored supplies all over the warehouse and that the building was largely an open space with furniture being moved back and forth between areas. Although employees had I.D. cards designating which company they worked for, Martinez admitted they were not punished if found in another area, and no written policy confining them to their designated area existed. In fact, the furniture Tri-State repaired was delivered in the very area where the accident occurred. Moreover, despite Martinez's testimony that he always instructed his employees not to use the forklifts, this policy was neither in writing nor posted anywhere in the warehouse, and both petitioner and Montero, a supervisor in the company, testified that they were unaware of the rule. Under these circumstances, and in light of the Act's broad remedial purpose and flexible approach to the concept of "control," we conclude that petitioner was injured in an area used and controlled by Tri-State "in the course of employment."

B.
Petitioner also claims that his injury "arose out of" his employment because *1130 he was not deviating from his job responsibilities at the time of the accident, and even if he was acting out of curiosity, his conduct only amounted to a momentary, impulsive act, which was still compensable. As noted, the judge held that petitioner's actions did not amount to a minor deviation or compensable horseplay because he had, in fact, abandoned his job to satisfy a purely personal interest when the accident occurred. We disagree.
The requirement that a compensable accident arise out of the employment looks to a causal connection between the employment and the injury. Coleman, supra, 105 N.J. at 290, 520 A.2d at 1344. It must be established that the work was at least a contributing cause of the injury and that the risk of the occurrence was reasonably incident to the employment. Ibid. Essentially, the test is "whether it is more probably true than not that the injury would have occurred during the time and place of employment rather than elsewhere." Id. at 290-91, 520 A.2d at 1344 (quoting Howard v. Harwood's Restaurant Co., 25 N.J. 72, 82, 135 A.2d 161, 166 (1957)). Unless it is more probable that the injury would not have occurred under the normal circumstances of everyday life outside of the employment, the necessary causal connection has not been established. Coleman, supra, 105 N.J. at 291, 520 A.2d at 1344.
This positional-risk doctrine recognizes three separate categories, only the first two of which are compensable: risks distinctly associated with the employment, such as an employee's fingers getting caught in a machine; neutral risks, such as an employee getting struck by lightning while on the job; and risks that result from a purely personal activity or condition of the employee, such as a heart attack suffered while on the job. Id. at 291-92, 520 A.2d at 1344-45; Money v. Coin Depot Corp., 299 N.J.Super. 434, 437, 691 A.2d 400, 402 (App.Div.), certif. denied, 151 N.J. 71, 697 A.2d 544 (1997). Applying the doctrine, our courts have engaged in careful, fact-specific inquiries. Coleman, supra, 105 N.J. at 290, 520 A.2d at 1343-44.
For example, in Coleman, the Court held that the claimant did not sustain a compensable injury when she set her hair on fire while smoking during a regular lunch hour on the employer's premises. 105 N.J. at 294, 520 A.2d at 1346. The Court emphasized that "no condition of the lunchroom," "no employment-related instrumentality," and no circumstances of the petitioner's employment "w[ere] causally related to the unhappy introduction of match to hair." Ibid. Rather, "the fact that the accident happened while she was on her employer's premises was the sheerest happenstance, wholly insufficient to supply the necessary nexus between the employment and the accident." Ibid. Likewise, in Zahner, supra, we found that the claimant's injury did not "arise out of her employment" when she fell on the employer's premises after she finished her shift and was grocery shopping. 321 N.J.Super. at 481, 729 A.2d at 484. Specifically, we noted that the claimant's personal grocery shopping was wholly unrelated to her work as a cashier, and therefore, any risks resulting from the fall did not "arise out of" her employment. Ibid.
The distinction between purely personal risks and those causally connected to an individual's employment is particularly relevant in those cases concerning an employee's temporary break from his work. An employee is not denied coverage simply because he was not actually working when the accident occurred. Secor v. Penn Service Garage, 19 N.J. 315, 321, 117 A.2d 12, 15 (1955). Accidents that result from minor deviations or an employee's curiosity about his work environment *1131 are still compensable. Ibid. Describing the type of behavior that fits this category, the Court in Secor recognized:
Along with all the other frailties of the average man  his carelessness, his prankishness, his tobacco habit, his cola habit, his inclination to rest once in a while and chat with his neighbor  there must also be expected one more: his natural human proclivity for sticking his head in mysterious openings, putting his fingers in front of fan blades, and pulling wires and pins on strange mechanical objects which he finds.
[Ibid. (quoting 1 Larson, Workmen's Compensation Law (1952) 453, 509).]
Even accidents resulting from an employee's own horseplay or foolhardy behavior may be compensable if the conduct only amounts to a `momentary or impulsive act.' Secor, supra, 19 N.J. at 323-24, 117 A.2d at 16; see also, Diaz v. Newark Indus. Spraying, Inc., 35 N.J. 588, 174 A.2d 478 (1961); McKenzie v. Brixite Mfg. Co., 34 N.J. 1, 166 A.2d 753 (1961).
On the other hand, a `deliberate and conscious excursion' from one's job responsibilities is not compensable. Robertson v. Express Container Corp., 13 N.J. 342, 347-48, 99 A.2d 649, 652 (1953). Thus, we have held that an injury sustained by an employee playing "Russian Roulette" while at work is not compensable because such behavior is "a major deviation from the normal course of employment which create[s] a substantial and extraordinary risk of physical harm...." Money, supra, 299 N.J.Super. at 439, 691 A.2d at 403. Likewise, in Klein v. New York Times Co., 317 N.J.Super. 41, 43-44, 721 A.2d 29, 30 (App.Div.1998), an employee was not entitled to compensation after breaking his hand when he intentionally and violently punched an electrical box in an "unreasonable reaction to a supervisor's commonplace personnel action."
Perhaps most relevant to the present case, however, is Trotter v. County of Monmouth, 144 N.J.Super. 430, 365 A.2d 1374 (App.Div.), certif. denied, 73 N.J. 42, 372 A.2d 308 (1976). There, an employee was injured after he crashed a fellow worker's motorcycle off the employer's premises, without obtaining permission to ride the bike, and contrary to his supervisor's orders. Id. at 432, 365 A.2d at 1376. We rejected the employee's petition because "[t]he vehicle was not supplied by his employer and was not equipment used in the course of employer's business ... petitioner's conduct was so far a deviation as to constitute an abandonment of his employment." Id. at 435, 365 A.2d at 1377.
Unlike the situation in Trotter, petitioner's injury was the result of an accident involving equipment used by his employer for business purposes, which he would have had no interest in operating if not for the possibility that it could have aided him at work, and which he probably would not have tried to use if not for the involvement of his immediate supervisor. Although the worker's compensation judge discredited the primary explanation offered by petitioner and Montero, namely, that they wanted to move sheetrock with the forklifts, the alternative version, which she did accept, was also directly related to petitioner's employment. Petitioner explained that he wanted to learn how to operate the forklifts because knowing how to do so would make him "more valuable" at work. Like the employee "pulling wires and pins on strange mechanical objects which he finds," petitioner was exposed to a risk unique to his work place, and due to his curiosity about how the equipment could help with his employment, whether to move sheetrock or supplies, he sustained a severe injury. That the forklifts were primarily controlled by Federated, and petitioner may not have seen other Tri-State *1132 employees using them, is of little import considering Martinez's own acknowledgment that the equipment was helpful and used by Tri-State employees. Further, despite the judge's finding to the contrary, it is entirely plausible that petitioner would have heard about other Tri-State employees using the forklifts, when, in fact, Bill Stuber did use them.
Most significantly, however, petitioner engaged in the activity that led to his injury with the acquiescence and company of his supervisor. Cf. Sager, supra, 182 N.J. at 163-69, 862 A.2d at 1123-27. Certainly, all activity engaged in with a supervisor is not compensable. For example, we have held that an employee is not entitled to compensation when he is injured arm wrestling with his supervisor in an organized tournament over lunch. Quinones v. P.C. Richard & Son, 310 N.J.Super. 63, 707 A.2d 1372 (App.Div.), certif. denied, 156 N.J. 384, 718 A.2d 1213 (1998). Here, however, Tri-State's manager left petitioner under the direct work supervision of Montero. Although the judge did not find this fact significant, we view Martinez's readiness to leave petitioner, who had only been employed for three months, alone in the warehouse with Montero as demonstrative of the degree of supervisory authority vested in Montero. Montero agreed that petitioner and he could operate the forklifts, and no written policy indicated otherwise, therefore, whether such use was to move sheetrock or satisfy mutual curiosity, petitioner acted reasonably in doing so.
Further, using the forklifts was not an unrelated leisure activity, like go-cart racing or arm wrestling. See Lozano v. Frank DeLuca Const., 178 N.J. 513, 842 A.2d 156 (2004); Quinones, supra, 310 N.J.Super. at 69-70, 707 A.2d at 1375-76. Rather, petitioner's curiosity was the direct result of his observation that the equipment was used in the course of his business. In other words, unlike injuries suffered while engaging in "customary or planned activities occurring during the lunch hour, coffee breaks, recreational periods or outings," Quinones, supra, 310 N.J.Super. at 69, 707 A.2d at 1376, petitioner's injury did not result from either a purely social or recreational activity, entirely unrelated to work. Thus, it is not subject to the provision of N.J.S.A. 34:15-7, which prohibits recovery for injuries incurred during such activities unless they "are a regular incident of employment and produce a benefit to the employer beyond improvement in employee health and morale...."
Nothing in Jumpp, supra, suggests to the contrary. In Jumpp, the Court considered the degree to which an employee could deviate from his work responsibilities while off the employer's premises, and ultimately rejected the claimant's petition because his decision to pick up his mail en route to a job site amounted to a deliberate and significant deviation. 177 N.J. at 482-84, 828 A.2d at 912-13. The Court did not eliminate the "minor deviation" rule or hold that on-premises and off-premises employees should be treated differently. Ibid. It simply found that particular claimant stepped outside his job responsibilities and was engaged in a personal pursuit akin to an "office worker who takes an afternoon break and crosses the street to pick up his personal mail at the local post office." Id. at 484, 828 A.2d at 913.
Here, even if we assume a deviation, we do not view petitioner's decision to operate a forklift as a calculated, substantial departure from his responsibilities. Tri-State recognizes that petitioner and Montero made considerable progress on the office that Saturday and had not clocked out when the accident occurred, indicating that they were fully engaged in their work. *1133 Likewise, they were working overtime, so the fact there were no other people around when they operated the forklifts does not in itself suggest they were purposefully engaging in planned prohibited behavior. In fact, the warehouse shut down at four p.m., and the accident did not occur until around six p.m., shortly after they realized that they would have to come back the next day and work more overtime in order to finish construction of the office as per Martinez's directive. Thus, even accepting the trial court's credibility determinations, it appears that petitioner only had occasion to operate the equipment due to his employment with Tri-State, and that the accident occurred while petitioner was engaging in the exact same activity as his immediate supervisor, and while he was still on the clock, after making substantial progress on the office. Accordingly, we conclude that petitioner's injury not only occurred during the "course of," but as well "arose out of" his employment.
Reversed and remanded.