713 A.2d 486

FELIPE RAMOS, PLAINTIFF–APPELLANT, v. M & F FASHIONS,
INC., RESPONDENT, AND SECOND INJURY FUND,
RESPONDENT–RESPONDENT.

Argued March 2, 1998—Decided July 13, 1998.

584

586

*Michael I. Murphy, Jr.*, argued the cause for appellant (*Freeman & Bass*, attorneys).

*Linda Schober*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

In this case, a worker suffered injuries when he fell down the shaft of a freight elevator in the building in which his employer was a fourth-floor tenant. The principal issue is whether the employee's injuries are compensable under the Workers' Compensation Act. Determination of that issue turns on whether the accident occurred on the employer's premises or whether it occurred beyond the employer's premises and, therefore, was not a compensable accident occurring in the course of employment under the premises rule of the Workers' Compensation Act.

## I

In 1984, when he was forty-two years old, Felipe Ramos moved to New Jersey from Puerto Rico, where he had lived since birth. In Puerto Rico, he had worked in sundry agricultural pursuits, including cutting sugar cane and picking coffee beans. When he was eighteen years old, as he was cutting grass so he could pick coffee beans, he severely injured his left hand with a machete. Four fingers on his hand were amputated below the first joint. Despite his incapacity, he continued to work in farming.

After he moved to the continental United States, Ramos lived with his brother, sister-in-law, nieces and nephews in Newark. Ramos could not find a job immediately after relocating to New Jersey. After approximately one year, M & F Fashions (M & F), a garment manufacturer, hired Ramos to be a presser.

M & F was one of two tenants located on the fourth floor of a five-story building at 50 Columbia Street in Newark. The building housed several employers, who rented portions of the building. Stairs and a freight elevator comprised the only two means of reaching M & F's fourth-floor factory.

Throughout his employment at M & F, Ramos earned $5.00 per hour and worked forty hours each week. Ramos used a steam table and lowered a press. He primarily used his left hand to perform those duties. During the workday, Ramos rode the

elevator to bring fabric up from the ground floor to M & F's plant. Furthermore, Ramos used the elevator to transport coats from the factory to the street for loading. One other employee also used the elevator during the day in the course of work.

Upon arriving for work, Ramos often took the elevator to get to the fourth floor. Employees of the other fourth-floor tenant also rode the elevator for passenger use, and other M & F employees may have done the same. But, most workers and Ramos's supervisors at M & F did not ride the elevator. Because the elevator doors occasionally would remain open during use, Ramos believed that they feared for their safety.

M & F required Ramos to arrive at work by 8:00 a.m., when an owner would open the factory's door. Though his bus ride was short and he could not punch in for work until 8:00, Ramos typically arrived each workday at 7:00. His pay would have been docked if he were late. When Ramos reached the building where he worked, someone from another establishment would let him inside. Then, Ramos would go upstairs, read the newspaper, drink coffee, and smoke a cigarette. He would not socialize with other people. Other M & F employees would begin to arrive at 7:30.

Ramos's superiors were aware of his habit of arriving early. One told him that his punctuality made him the best employee.

On May 13, 1988, Ramos arrived for work at 7:00 a.m., and an employee of another company opened the building door for him. Ramos walked to the elevator, the door of which was open eighteen-inches wide. He opened the door an additional foot. When he stepped into the elevator, he fell down the shaft. He plunged between eight to ten feet and was seriously injured.

Ramos was hospitalized in University Hospital for two weeks in May and an additional four days in June, when he underwent surgery. In the surgical procedure, doctors grafted bone from Ramos's right hip onto his left wrist. Ramos's injuries included a cerebral concussion, which caused him to lose consciousness, a

fractured pelvis, a spinal sprain and fracture, and the fracture and fusion of his left wrist. Ramos continues to experience sharp pain in his lower back and left hand, pain in his left wrist, arm, and hip, headaches, and impotence. He can no longer lift weights and run, as he had done once per week before the accident. Psychologically, Ramos suffers from post-traumatic stress disorder and depression. Because of the pain, Ramos has not worked or applied for jobs since the accident.

Ramos filed an action against the landlord. As a result, he obtained a $100,000 settlement. After paying his medical bills and attorney's fees, he retained approximately $31,000.

Ramos filed a Worker's Compensation claim. M & F went out of business shortly after the accident; accordingly, M & F did not defend against Ramos's claim. Nonetheless, the Second Injury Fund (SIF) has opposed Ramos's application for worker's compensation benefits. In this case, hearings occurred on eight days between November 9, 1994, and September 13, 1995.

Ramos testified as a witness. In addition, Ramos elicited the testimony of Doctors I. Ahmad and Samuel L. Pollock, both of whom diagnosed him in December 1990. They testified that Ramos is permanently totally disabled. Two SIF expert witnesses, Doctors Jack G. Siegel and David J. Flicker, expressed that Ramos had a twelve-and-one-half-percent permanent partial orthopedic disability and ten-percent permanent partial neuropsychiatric disability, respectively.

On September 13, 1995, the compensation court concluded that Ramos's injuries were compensable. The court determined that the accident occurred in the course of employment because, in part, Ramos was injured on an elevator used by M & F for business purposes. The court also held that the mishap took place in the course of employment though work was not scheduled to begin until one hour after the accident. The court found credible Ramos's explanation for his early arrivals and concluded that Ramos was, indeed, reporting for work when he was injured. The court determined that Ramos was permanently totally disabled.

It ruled that the accident caused two-thirds of the total disability. Thus, the court apportioned two-thirds of the fault to M & F and one-third to the SIF.

The Appellate Division reversed. 302 *N.J.Super.* 24, 694 *A.*2d 586 (1997). The court held that Ramos was not injured in the course of employment. *Id.* at 34, 694 *A.*2d 586. The court noted that, under the going and coming rule, Ramos's injuries would be compensable only if they occurred in an area under the employer's control. *Id.* at 30–31, 694 *A.*2d 586. According to the court, M & F did not direct Ramos to use the elevator, and Ramos used the elevator as a matter of choice. *Id.* at 31, 694 *A.*2d 586. M & F's use of the elevator does not equate with its control, and the elevator was a common area that many tenants used. *Id.* at 32–33, 694 *A.*2d 586.

The appellate court also found that Ramos's injuries were not compensable because the accident occurred an hour before the scheduled commencement of work. *Id.* at 34, 694 *A.*2d 586. The court recognized that employment does not begin until an employee arrives at an employer's place of business for work. *Ibid.* The court determined that Ramos did not arrive for work; rather, he appeared at the employer's building early in order to drink coffee, read a newspaper, and smoke a cigarette. *Ibid.*

Because the Appellate Division concluded that Ramos's injuries were not compensable, the court did not determine whether Ramos's disability is permanent and total.

This Court granted Ramos's petition for certification. 151 *N.J.* 468, 700 *A.*2d 880 (1997).

## II

The initial, sharp dispute in this case is over whether the accident transpired on M & F's premises. The SIF contends that Ramos injured himself in a common area that the employer did not control and, thus, the injury is not compensable. On the other hand, Ramos asserts that common areas, such as an elevator, in an

employer's building should be deemed part of the employer's premises. In the alternative, Ramos argues that M & F controlled the elevator because it directed him and another employee to ride the freight elevator to transport clothing and materials.

■ The premises rule distinguishes between an accident that occurred on the employer's premises and one that did not. *N.J.S.A.* 34:15–36. That rule, with two exceptions inapplicable in this case, excludes from compensation accidental injuries that occur beyond the employer's premises. The rule states:

> Employment shall be deemed to commence when an employee arrives at the employer's place of employment to report for work and shall terminate when the employee leaves the employer's place of employment, excluding areas not under the control of the employer.
>
> *[Ibid.]*

The premises rule was designed to overcome the expansive exceptions to its application that occurred under the going-and-coming rule. "The 'going and coming rule' that existed in workers' compensation jurisprudence since the inception of the Act was abrogated by the 1979 amendments to the Act." *Kristiansen v. Morgan*, 153 *N.J.* 298, 316, 708 *A.2d* 1173, 1182 (1998); *see also Serrano v. Apple Container*, 236 *N.J.Super.* 216, 221, 565 *A.2d* 417 (App.Div.1989) ("[T]he 'going and coming rule' has come and gone."). "In its place, the Legislature established the premises rule. That was accomplished by defining for the first time when employment begins and ends." *Kristiansen, supra*, 153 *N.J.* at 316, 708 *A.2d* at 1182.

■ "[A]s a general rule we interpret the statute as not allowing compensation for accidents occurring in areas outside of the employer's control." *Zelasko v. Refrigerated Food Express*, 128 *N.J.* 329, 336, 608 *A.2d* 231 (1992). However, under the language of the premises rule, employment commences "when an employee arrives at the employer's place of employment," and an accident that occurs after the employee reaches an "area[ ] under the control of the employer" may be compensable. *N.J.S.A.* 34:15–36.

Because neither of the premises rule's exceptions apply, M & F must have controlled the freight elevator in order for Ramos's injury to be compensable. *See Novis v. Rosenbluth Travel*, 138 *N.J.* 92, 96, 649 *A.*2d 69 (1994) (finding injury noncompensable because the accident occurred on a sidewalk over which the employer exercised no control). Control as defined in the Workers' Compensation Act differs from control in the "formal property law sense"; the former definition is more expansive. *Livingstone v. Abraham & Straus, Inc.*, 111 *N.J.* 89, 105, 543 *A.*2d 45 (1988) (finding control under the Workers' Compensation Act despite the absence of control according to property law); *Ehrlich v. Strawbridge & Clothier*, 260 *N.J.Super.* 89, 92, 615 *A.*2d 286 (App.Div. 1992) (same).

■ The evidence establishes that M & F did, in fact, regularly use the freight elevator for business purposes. Ramos and one other M & F employee used the elevator in order to transport fabric and clothing between the ground floor and the fourth floor. Moreover, some employees used the elevator for purpose of ingress and egress, and those who did not apparently did so as a matter of personal choice. Because M & F operated the freight elevator for conducting business, M & F had control of the elevator. *See Livingstone, supra*, 111 *N.J.* at 105, 543 *A.*2d 45 (1988) (holding employer had control over portion of a parking lot in which employees were told to park); *Ehrlich, supra*, 260 *N.J.Super.* at 92, 615 *A.*2d 286 (holding employer had control over staircase and adjacent sidewalk on which employees were told to travel for ingress and egress); *Cressey v. Campus Chefs, Div. of CVI Serv., Inc.*, 204 *N.J.Super.* 337, 343, 498 *A.*2d 1274 (App.Div. 1985) (holding employer had control over loading dock used for delivery and storage).

■ The fact that Ramos was not moving fabric or clothing at the time of the accident did not divest M & F of control of the elevator. Control in this context imports the notion of the capacity, ability or power to occupy, possess or use. There is no suggestion that control for one purpose does not authorize control

for other purposes. Rather, when an employer uses a common area for business purposes, the common area is, by virtue of that use, subject to the employer's control and considered part of the employer's premises within the intendment of the Workers' Compensation Act. Moreover, control is not a temporal concept. The boundaries of an employer's premises do not shift with the hour; instead, they are established until the employer relinquishes and ceases to use the site.

Further, the fact that M & F did not have exclusive control of the elevator does not place it beyond M & F's workplace premises. "[T]he phrase 'excluding areas not under the control of the employer' does not relate to concepts of exclusive control or duties of maintenance ... but, rather, implies only use by the employer in the conduct of his business." *Cressey, supra,* 204 *N.J.Super.* at 343, 498 *A.*2d 1274.

Notably, the cases interpreting the term "control" in the Workers' Compensation Act have involved common areas that were not under the exclusive control of the employer. *See Novis, supra,* 138 *N.J.* at 96, 649 *A.*2d 69; *Livingstone, supra,* 111 *N.J.* at 104–06, 543 *A.*2d 45; *Ehrlich, supra,* 260 *N.J.Super.* at 92, 615 *A.*2d 286; *Cressey, supra,* 204 *N.J.Super.* at 343–44, 498 *A.*2d 1274. Those cases consider only whether the employer used a common area to conduct its business. *See Novis, supra; Livingstone, supra; Ehrlich, supra; Cressey, supra.* Thus, it is the employer's conduct that determines whether it had control over a common area. The evidence establishing the employer's general use of the freight elevator for its business purposes clearly implies a capacity to authorize its use for other purposes, such as ingress and egress. In this setting, the capacity to authorize use is the essence of control.

In sum, M & F is considered to have had control of the freight elevator if the employer used it in conducting business and allowed the employees to use it. Because M & F had its employees, including Ramos, ride the elevator to transport fabric and clothing and because its employees could, and did, use the elevator for

ingress and egress, M & F had control over the elevator. Consequently, the accident that befell Ramos through his use of the elevator occurred on the employer's premises within the meaning of the Workers' Compensation Act.

Ramos also contends that he had indeed reported for work and that his "[e]mployment [is] deemed to [have] commenced," *N.J.S.A.* 34:15–36, at the time of the mishap. He professes that he arrived one hour before the scheduled commencement of the workday because doing so was his habit of which he was proud. The SIF contests Ramos's explanation of his early arrival. The SIF maintains that Ramos arrived early for personal purposes, including drinking coffee, smoking a cigarette and reading the newspaper.

The compensation court concluded that Ramos's testimony that he arrived early for the sole purpose of reporting for work was credible. The court expounded:

> At first I was somewhat mystified as to his story about going to work early every day, it just didn't seem likely, but the more I observed him, the more I saw the type of operation that was involved, the fact that he took a bus to work, single man, he was a victim of habit, I suppose, and I have finally come around to accepting that version of the story.

The factual findings of the compensation court are entitled to substantial deference. An appellate court must

> limit[ ] its inquiry solely to whether the findings made by the Judge of Worker's Compensation could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of one who heard the witnesses to judge of their credibility and with due regard to his expertise.

*Bradley v. Henry Townsend Moving & Storage Co.*, 78 *N.J.* 532, 534, 397 *A.*2d 323 (1979); *accord Sheffield v. Schering Plough Corp.*, 146 *N.J.* 442, 461, 680 *A.*2d 750 (1996); *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965).

Sufficient credible evidence in the record sustains the compensation court's findings. Most importantly, Ramos himself testified that he arrived at the office in order to report for work—not to drink coffee, smoke a cigarette or read the newspaper. While he

often drank coffee, smoked or read while he waited, he could have done those activities at home. He testified that he arrived at 7:00 a.m. each day as a matter of habit because he "wanted to be early for work." His supervisor told him that he "was his best employee because [Ramos] was always there on time." We must accept the compensation court's conclusion that Ramos was a credible witness.

Moreover, objective evidence bolsters the court's conclusion that Ramos had reported for work on the morning of the accident. At that time, Ramos had lived in the continental United States for under four years, and he did not proficiently speak English. It took him a year to find a job. In Puerto Rico, all of his work experience was in the agriculture industry. Four fingers on Ramos's left hand had been amputated past the first joint. These facts suggest that Ramos stood on the fringes of the labor market. Given his injured hand and limited mastery of the English language, Ramos may have had difficulty in finding another job and may not have felt secure in his employment with M & F. Perhaps arriving early gave Ramos confidence of his chances of retaining his job. Other employees also arrived early. Moreover, if Ramos had arrived late, his pay would have been docked. His supervisor praised him for arriving early. In conclusion, Ramos's habit of arriving one hour early in order to report for work, while idiosyncratic, was understandable.

The compensation court's conclusion that Ramos had reported for work at the time of the accident is supported by credible evidence in the record.

In sum, because M & F controlled the freight elevator on which Ramos was injured and Ramos had reported for work on the morning of the mishap, we hold that Ramos's injury is compensable. Therefore, we reverse the Appellate Division.

### III

Because Ramos's injury is compensable, we must determine if the compensation court's finding that Ramos was permanently and

totally disabled was supported by sufficient evidence in the record.[1]

To support his claim of permanent total disability, Ramos presented two expert witnesses, Doctors Ahmad and Pollock, who had examined Ramos approximately four and one-half years before they testified. In finding Ramos's disability permanent and total, the compensation court credited their testimony.

The SIF asserts that Doctors Ahmad and Pollock based their expert testimony on medical examinations that were too stale. Ramos responds that a recent medical examination was not necessary because a permanent total disability cannot be found unless "no fundamental or marked improvement in such condition can be reasonably expected." *N.J.S.A.* 34:15–36.

The SIF correctly observes that an expert opinion that a person has suffered a permanent partial disability must be supported by a recent medical examination. Awards of permanent partial disability cannot be based on "medical examinations performed shortly after accidents and well before the hearings in the absence of recent objective medical evidence of continued impairment." *Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 119, 469 *A.*2d 22 (1984). For example, medical examinations that occurred within two months of the accident but three years prior to the determination of disability cannot support a finding of permanent partial disability. *Allen v. Ebon Servs. Int'l, Inc.*, 237 *N.J.Super.* 132, 136, 567 *A.*2d 228 (App.Div.1989).

Nonetheless, a finding of permanent total disability differs from a finding of permanent partial disability. The statutory definitions of the two types of disability diverge.

"Disability permanent in quality and partial in character" means a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the function of

---

[1] Because the Appellate Division did not decide this issue, neither party raises it in their briefs before this Court. But, both parties litigated this issue before the Appellate Division.

the body or of its members or organs; included in the criteria which shall be considered shall be whether there has been a lessening to a material degree of an employee's working ability.

\* \* \*

"Disability permanent in quality and total in character" means a physical or neuropsychiatric total permanent impairment caused by a compensable accident or compensable occupational disease, where no fundamental or marked improvement in such condition can be reasonably expected.

[*N.J.S.A.* 34:15–36.]

Unlike permanent partial disability, a finding of permanent total disability cannot be made unless the injured person cannot be reasonably expected to make a fundamental or marked improvement. To be final, the diagnosis must be made at a time when it may be presumed that the disability has become permanent. Because a person diagnosed with a permanent total disability, by definition, cannot be reasonably expected to improve fundamentally, it can be inferred that the person has not made a marked improvement since the diagnosis. Consequently, a recent medical examination is not as vital for a finding of permanent total disability as it is for a permanent partial disability determination. While "the validity of a medical finding of a permanent injury may decrease with the passage of time," *Perez, supra,* 95 *N.J.* at 119, 469 *A.*2d 22, an older medical examination is competent evidence of a permanent total disability if it was undertaken after permanency occurred.

▮ Notably, Doctors Ahmad and Pollock examined Ramos over two and one-half years after the accident. The thirty-one-month lag between the accident and the examinations gave the doctors an opportunity to evaluate Ramos's long-term recovery from his injury. Accordingly, when they conducted their examinations, Doctors Ahmad and Pollack had a basis for determining that Ramos's condition could not have been reasonably expected to make a fundamental or marked improvement. Therefore, the doctors' expert testimony constituted sufficient evidence that Ramos's disability was permanent and total.

The compensation court had the opportunity to evaluate witnesses' credibility. In addition, the court had expertise with respect to weighing the testimony of competing medical experts and appraising the validity of Ramos's compensation claim. *See Lewicki v. New Jersey Art Foundry,* 88 *N.J.* 75, 89, 438 *A.*2d 544 (1981) (recognizing the deference entitled to compensation courts due to their expertise). Because sufficient credible evidence supported the compensation court's finding that Ramos's disability was permanent and total, we must uphold that judgment. *See Sheffield, supra,* 146 *N.J.* at 461, 680 *A.*2d 750 (deferring to and upholding the compensation court's conclusions); *Paul v. Baltimore Upholstering Co.,* 66 *N.J.* 111, 121–22, 328 *A.*2d 610 (1974) (holding it is within the compensation court's province to accept the testimony of the claimant's experts and reject the testimony of the opposing physicians); *Perez v. Capitol Ornamental,* 288 *N.J.Super.* 359, 367–68, 672 *A.*2d 719 (App.Div.1996) (deferring to and upholding the compensation court's conclusions based on proper legal principles).

## IV

We hold that Ramos's accident occurred in the course of employment and that he was permanently and totally disabled as a result. The judgment of the Appellate Division is reversed.

POLLOCK, J., dissenting.

The Workers' Compensation Act (the Act) is a carefully constructed legislative plan for providing benefits to workers injured in the workplace. It represents the Legislature's best judgment on the appropriate allocation between employers and employees of the costs and benefits for such injuries.

Originally enacted in 1911, the Act was substantially amended in 1979. One goal of the Legislature when enacting the 1979 amendments was to reverse this Court's creation of exceptions to the "going and coming rule." That rule bars a worker from collecting workers' compensation benefits for injuries that occur while the

employee is going to or coming from work. *Hammond v. Great Atlantic & Pacific Tea Co.*, 56 *N.J.* 7, 11, 264 *A.*2d 204 (1970).

In the first four decades under the Act, courts confined compensable injuries to those that occurred in the workplace. *See* Jon L. Gelman, *New Jersey Practice, Workers' Compensation Law* § 8.4 (2d ed.1994); *Gullo v. American Lead Pencil Co.*, 119 *N.J.L.* 484, 196 *A.* 438 (E. & A.1938) (denying workers' compensation benefits to employee who slipped and fell on sidewalk adjacent to factory where employee worked). Then, courts began interpreting the Act more liberally to extend benefits beyond the workplace. Gelman, *supra*, § 8.4. Ultimately, courts developed so many exceptions that little was left of the original rule. *Watson v. Nassau Inn*, 74 *N.J.* 155, 159, 376 *A.*2d 1215 (1977).

In 1979, the Legislature amended the Act to overcome certain inequities to both employers and employees. The Joint Statement of the Senate Labor, Industry and Professions Committee and the Assembly Labor Committee states:

> The bill would put significantly more money into the hands of the more seriously injured workers while providing genuine reform and meaningful cost containment for New Jersey employers from unjustified workers' compensation costs that are presently among the highest in the nation.
>
> * * *
>
> This legislation would benefit employers by: ...
> establishing relief from the far-reaching effect of the "Going and Coming Rule" decisions by defining and limiting the scope of employment.
>
> [*Senate Labor, Industry & Professions Committee, Joint Statement to substitute for S. 802 & A. 840*, at 1–2 (1979).]

Specifically, the Act defines "employment":

> Employment shall be deemed to commence when an employee arrives at the employer's place of employment to report for work and shall terminate when the employee leaves the employer's place of employment, excluding areas not under the control of the employer.
>
> [*N.J.S.A.* 34:15–36.]

Just four months ago, this Court acknowledged that the effect of the 1979 amendments was to abrogate the "going and coming" rule as it had evolved under the Act. *Kristiansen v. Morgan*, 153

*N.J.* at 314, 708 *A.2d* at 1181 (1998). As the Appellate Division noted, "It is time to recognize that the 'going and coming rule' has come and gone." *Serrano v. Apple Container,* 236 *N.J.Super.* 216, 221, 565 *A.2d* 417 (App.Div.1989), *certif. denied,* 121 *N.J.* 591, 583 *A.2d* 298 (1990). Under the majority opinion, however, the "going and coming" rule—and its exceptions—have returned.

Critical to the majority's reasoning is its definition of "control" in *N.J.S.A.* 32:15–36. As one would expect with remedial legislation, the Court has interpreted "control" not in its "formal property law sense," *Livingstone v. Abraham & Straus, Inc.,* 111 N.J. 89, 105, 543 A.2d 45 (1988), but in a common sense manner. *Id.* at 103, 543 *A.2d* 45. Previously, the Court has interpreted the term "as not allowing compensation for accidents occurring in areas outside of the employer's control, as when the employee is going to and coming from work." *Zelasko v. Refrigerated Food Express,* 128 *N.J.* 329, 336, 608 *A.2d* 231 (1992). The majority's definition of "control," however, creates a revolving door for the "going and coming" rule to go and come with abandon.

According to the majority:

> Control in this context imports the notion of the capacity, ability or power to occupy, possess or use. There is no suggestion that control for one purpose does not authorize control for other purposes. Rather, when an employer uses a common area for business purposes, the common area is, by virtue of that use subject to the employer's control and considered part of the employer's premises within the intendment of the Workers' Compensation Act. Moreover, control is not a temporal concept. The boundaries of an employer's premise do not shift with the hour; instead, they are established until the employer relinquishes and ceases to use the site.
>
> [*Ante* at 592–93, 713 *A.2d* at 491.]

In this case, the employee was injured while taking a freight elevator from the first floor of a building to his place of employment on the fourth floor of a five-story building. Most of the workers, including the employee's supervisor, did not ride the elevator to work. Various businesses in the building used the elevator for its intended purpose of carrying freight. As the

Appellate Division concluded, "the freight elevator was a common area." 302 *N.J.Super.* at 33, 694 *A.*2d 586.

The majority, however, concludes that

In this setting, the capacity to authorize use is the essence of control.

In sum, M & F is considered to have had control of the freight elevator if the employer used it in conducting business and allowed employees to use it. Because M & F had its employees, including Ramos, ride the elevator to transport fabric and clothing and because its employees could, and did, use the elevator for ingress and egress, M & F had control over the elevator. Consequently, the accident that befell Ramos through his use of the elevator occurred on the employer's premises within the meaning to the Workers' Compensation Act.

[*Ante* at 593–94, 713 *A.*2d at 491–92.]

More faithful to the legislative intent is the conclusion of the Appellate Division:

[Ramos] bears the burden of establishing that M & F exercised control over the area where he was injured. The record reveals that he has failed to demonstrate such fact. The course of entry taken by [Ramos], to use the freight elevator to gain access to the fourth floor, was selected pursuant to [Ramos'] independent choice. M & F did not mandate that its employees use the freight elevator to gain entrance to the factory, thus [Ramos'] accident was not incident to any action on M & F's part to exercise control of employee's off-premises freedom.

[302 *N.J.Super.* at 31, 694 *A.*2d 586.]

Workers' compensation cases by their nature are fact sensitive. The case that presents the closest facts to the instant case is *Novis v. Rosenbluth Travel,* 138 *N.J.* 92, 649 *A.*2d 69 (1994). In *Novis,* this Court unanimously reversed an award of compensation benefits to an employee "who had traveled out of town on behalf of her employer, sustained injuries while walking across the only sidewalk leading from an office building parking lot to the entrance of the office building in which her employer's branch office was located." *Id.* at 93, 649 *A.*2d 69. The Court rejected the argument that it adopts today—that use equates with control. The Court stated that "[The employer] exercised no control over any portion of the parking lot adjacent to the office building in which its branch office was located. [The employer] simply shared the lot with the other tenants...." *Id.* at 96, 649 *A.*2d 69.

The two cases on which the majority primarily relies are distinguishable. In both of those cases, unlike in the present case,

the employer exercised greater control over the area where the accident occurred. In *Livingstone, supra,* the employer, an anchor tenant in the Short Hills Shopping Mall, had instructed its employees by written notice to park in the far corner of the parking lot. 111 *N.J.* at 91, 543 *A.*2d 45. The purpose of the directive was to save more convenient parking spaces for customers. *Ibid.* The lot, although not owned or maintained by the employer, was "effectively equivalent to an employer-owned lot" because the employer directed the employees to park in a designated area. *Id.* at 104–05, 543 *A.*2d 45.

In *Cressey v. Campus Chefs, Div. of CVI Serv., Inc.,* 204 *N.J.Super.* 337, 498 *A.*2d 1274 (App.Div.1985), the only egress required employees to use a rear door leading to a loading dock. *Id.* at 340, 498 *A.*2d 1274. Steps led from the dock to a ramp below. *Ibid.* When they could not use the ramp, the employees stepped from the loading dock to a retaining wall along side the ramp, proceeded around a corner, and to the ground. *Ibid.* Cressey was injured when he fell while trying to walk around the corner of the loading dock. *Id.* at 341, 498 *A.*2d 1274. In finding that the loading dock holds "an unusual risk," the Appellate Division relied on the fact that the employee "was required by [the employer] to traverse a hazard route in leaving the place of employment." *Id.* at 344, 498 *A.*2d 1274. M & F, in contrast, did not "require" Ramos to use the freight elevator to get to work. Ramos simply chose to use the elevator instead of walking up the stairs.

When amending the Act in 1979, the Legislature could have drafted a rule that granted more liberal benefits to employees who were injured while going to and coming from work. The Legislature, however, made a different policy choice. A court's task is not to rewrite the Act to impose an allocation of costs and benefits that it deems inappropriate, but to recognize the allocation made by the Legislature.

I would affirm the judgment of the Appellate Division.

Justice GARIBALDI joins this opinion.

*For reversal*—Chief Justice PORITZ and Justices HANDLER, O'HERN, STEIN and COLEMAN—5.

*For affirmance*—Justices POLLOCK and GARIBALDI—2.