**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2770-19

KATHLEEN WALKER,

  Petitioner-Appellant,

v.

SAKER SHOP-RITE,

  Respondent-Respondent.

_____

> Argued June 1, 2021 – Decided September 7, 2021
>
> Before Judges Messano and Hoffman.
>
> On appeal from the Department of Labor and Workforce Development, Division of Workers' Compensation, Claim Petition No. 2019-671.
>
> Mark T. Apostolou, Jr., argued the cause for appellant (Shebell & Shebell, LLC, attorneys; Mark T. Apostolou, Jr., of counsel and on the briefs; Nicholas V. Klimowicz, on the briefs).
>
> John V. Mallon argued the cause for respondent (Chasssan Lamparello Mallon & Cappuzzo, PC, attorneys; John V. Mallon, of counsel and on the briefs; Richard W. Fogarty, on the briefs).

PER CURIAM

This workers compensation case arises from a trip and fall accident that occurred on December 11, 2018, when petitioner Kathleen Walker, an employee of the Saker ShopRite (Saker) supermarket in Neptune, stepped into a pothole as she walked to her car in the parking lot, after completing her shift. Saker maintained an employee break area near the location of petitioner's fall.

Petitioner appeals from the January 28, 2020 order entered by a judge of compensation, dismissing her claim with prejudice. The judge found that petitioner's accident did not occur in an area under Saker's control nor in an area designated by Saker for employee parking. Based on these findings, the judge concluded the accident did not take place in the course of petitioner's employment. Because we conclude that petitioner's accident did, in fact, occur in an area under Saker's control, and that petitioner engaged in no unsafe conduct, we reverse.

I.

In December 2018, petitioner was seventy years old. She had been working for Saker for thirty-one years and at the Neptune ShopRite for twenty-five years. For much of the time she worked at the Neptune location, petitioner

2

drove to work and parked in the Saker's side parking lot. This side parking lot abutted a side entrance to the supermarket, which was open to customers.

The shopping center where this accident occurred contains approximately eight to ten stores, with Sakers' supermarket occupying the last leased space on the south end. According to petitioner, the side parking lot area where she fell contained – in addition to parking places – "a cabana type thing. . . . [t]hat [Saker] put there . . . in case any of the employees smoked cigarettes, they didn't want them by the front door . . . . So that's where [employees] went out and had coffee or cigarettes, right there." Next to the cabana, Saker used the sidewalk to hold shopping carts. Petitioner said she had parked in this same area "[s]ince the store was opened, twenty-five years."

While acknowledging that Saker had previously told its employees, "we want everybody to park out by the street[,]" petitioner stated she used the side parking lot due to safety concerns. Petitioner recounted that she had a conversation with Jen, an assistant manager of the liquor department where she worked, explaining why she parked in the area of the lot where her accident occurred: "I told her it's very dangerous to be parking anywhere else . . . . She didn't say [I had] to move[,]" nor did anyone else. Petitioner's conversation with Jen took place "years" before her accident; in addition, petitioner said other

3

employees also parked in the side lot, rather in the designated area near the street.

Saker leased its Neptune supermarket from the landlord in 1992, and the lease remained in effect, with some amendments, at the time of petitioner's fall. Pursuant to the lease, Saker pays a common area maintenance (CAM) fee to the landlord, based on its "pro-rata share of the entire shopping center" for "maintenance of the parking lot, insurance, snow removal, cleaning, sweeping, patching," etc.

The lease further stated, "Landlord shall keep and maintain or permit the operator of the premises . . . to keep and maintain the common area in good condition and repair including but not limited to repairing and replacing pavement." In February 2018, Saker and the landlord amended the lease, empowering Saker to complete "[r]econfiguration [w]ork[,]" which included installation of a "raised and extended sidewalk" and "vehicular directional signage . . . ." Additionally, it authorized Saker to perform "[r]estoration [w]ork[,]" described as "[r]e-milling, repaving, and restriping of parking lot" and "paving repairs in the rear of the [p]remises."

Saker's general counsel (the GC) provided the following explanation for this amendment:

> The landlord did not want to bother going to the Planning Board getting the approvals and doing the work. The landlord took the position that if [Saker] did it the landlord would reimburse [Saker] for the cost of doing the work and the landlord would continue to maintain everything in the parking lot.

However, according to the GC, Saker's ability to repave the lots was "subject to getting Planning Board approval to do the work." Saker did not obtain such approval until after petitioner's fall, though the GC attended several planning board meetings before approval issued. Saker ultimately repaved the front parking lot after petitioner's accident.

Saker's Human Resources Manager (the HR Manager) advised new employees to park in the "designated employee parking area." On cross-examination, she acknowledged regularly observing store employees parking in non-designated parking areas and asking them to move their cars to the designated area. She also confirmed that certain Saker employees had the responsibility of retrieving shopping carts from the parking lot; in addition, those employees were asked to keep an eye out for any hazards in the parking lot and to report such hazards to management.

Since the landlord owned and maintained the parking lot for the shopping center, including the side parking lot where petitioner sustained her injury, the judge held that "[p]etitioner fell in an area that was not owned or controlled by

5

[Saker]." The judge further found that "[p]etitioner had knowledge of the [Saker]'s directive as to the location of the proper parking area[,]" but "consciously chose to ignore [Saker]'s directive to park in the designated area." He therefore ruled that "the matter is not compensable and is dismissed."

Because the record contains substantial evidence that Saker used and exercised control over the parking lot area abutting its supermarket, including the area where petitioner fell, and because the record lacks any evidence that Saker's directive to park in the designated employee parking area was for the safety of its employees, we are constrained to reverse.

II.

Our review in workers' compensation cases is limited to "whether the findings made could have been reached on sufficient credible evidence present in the record . . . ." Hersh v. Cnty. of Morris, 217 N.J. 236, 243 (2014) (quoting Sager v. O.A. Peterson Constr., Co., 182 N.J. 156, 164 (2004)). We give "substantial deference" to the factual findings of a judge of compensation "in recognition of the compensation judge's expertise and opportunity to hear witnesses and assess their credibility." Goulding v. NJ Friendship House, Inc., 245 N.J. 157, 167 (2021) (quoting Ramos v. M & F Fashions, Inc., 154 N.J. 583,

6

594 (1998)). We do not defer to a judge of compensation's legal conclusions. Hersh, 217 N.J. at 243.

In applying provisions of the Workers' Compensation Act[1] (the Act), our Supreme Court "has long stressed that it 'is humane social legislation designed to place the cost of work-connected injury upon the employer who may readily provide for it as an operating expense.'" Goulding, 245 N.J. at 167 (quoting Tocci v. Tessler & Weiss, Inc., 28 N.J. 582, 586 (1959)). As a result, our courts have "liberally constru[ed] the Act to implement the legislative policy of affording coverage to as many workers as possible." Ibid. (quoting Brower v. ICT Grp., 164 N.J. 367, 373 (2000)). See also Zahner v. Pathmark Stores, Inc., 321 N.J. Super. 471, 477 (App. Div. 1999) (noting the courts' liberal construction of the Act's provisions in favor of employees to accomplish its "beneficent purposes").

Entitlement to workers' compensation benefits is controlled by the premises rule set forth in N.J.S.A. 34:15-36. See Kristiansen v. Morgan, 153 N.J. 298, 316-17 (1998). The statute provides that "[e]mployment shall be deemed to commence when an employee arrives at the employer's place of employment to report for work and shall terminate when the employee leaves

_____

[1] N.J.S.A. 34:15-1 to -128.

the employer's place of employment, excluding areas not under the control of the employer . . . ."  N.J.S.A. 34:15-36.

"The premises rule is based on the notion that an injury to an employee that happens going to or coming from work arises out of and in the course of employment if the injury takes place on the employer's premises."  Kristiansen, 153 N.J. at 316 (citing Cressey v. Campus Chefs, 204 N.J. Super. 337, 342-43 (App. Div. 1985)).  "The premises rule 'limits recovery to injuries which occur on the employer's premises . . . by confining the term "course of employment" to the physical limits of the employer's premises.'"  Ibid. (alteration in original) (quoting Cressey, 204 N.J. Super. at 342).  The Court has further noted:

> The Legislature used the phrase "excluding areas not under the control of the employer" in its definition of employment because it intended to include areas controlled by the employer within the definition.  That phrase was intended to make clear that the premises rule can entail more than the four walls of an office or plant.
>
> [Ibid.]

Consistent with that interpretation, the Court has recognized that "[c]ontrol as defined in the Workers' Compensation Act differs from the 'formal property law sense'; the former definition is more expansive."  Ramos v. M & F Fashions, Inc., 154 N.J. 583, 592 (1998).  "The pivotal questions under the

premises rule are (1) where was the situs of the accident, and (2) did the employer have control of the property on which the accident occurred." Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 350 (App. Div. 1999) (citing Kristiansen, 153 N.J. at 316-17).

The Court has addressed the premises rule in other cases. In Livingstone v. Abraham & Straus, Inc., 111 N.J. 89 (1988), the Court found compensable injuries sustained by an employee walking from an employee parking area in a mall parking lot. Id. at 90. The Court confirmed that "lots owned, maintained, or used by employers for employee parking are part of the employer's premises" for purposes of the premises rule. Id. at 102.

In Ramos, the employee was injured after falling into an elevator shaft in his employer's premises after arriving at 7:00 a.m., about an hour before his shift began at 8:00 a.m. 154 N.J. at 588. The Court held the accident was compensable under the Act even though the employee had not yet started his shift and habitually arrived early to drink coffee, read the newspaper, and smoke a cigarette. Id. at 594-95. The employee's workplace was located on the fourth floor of a multi-tenant building, and the employee fell while attempting to enter the elevator on the first floor. Id. at 587, 600. The Court found the employer had sufficient control over the elevator such that it was the employer's premises

A-2770-19

because the employer "regularly use[d] the freight elevator for business purposes." Id. at 592. Specifically, the employer "had its employees, including [the injured employee], ride the elevator to transport fabric and clothing and because its employees could, and did, use the elevator for ingress and egress, [the employer] had control over the elevator." Id. at 593-94. The Court noted, "the fact that [the employer] did not have exclusive control of the elevator does not place it beyond . . . workplace premises." Id. at 593.

In its analysis, the Court noted, among other things, that the fact that the employee was injured before the workday began did not affect the outcome. Id. at 593-94. As the Court observed, "control is not a temporal concept. The boundaries of an employer's premises do not shift with the hour; instead, they are established until the employer relinquishes and ceases to use the site." Id. at 593.

Under the Act, the meaning of the term "control" is "more expansive than under formal property law concepts." Brower, 164 N.J. at 372. "It is well-established in workers' compensation jurisprudence that when compensability of an accident depends on control of the employer, that test is satisfied if the employer has the right of control; it is not necessary to establish that the employer actually exercised that right." Id. at 372-73.

Here, the circumstances clearly support the petitioner's position that her parking lot accident is subject to the exclusive remedies provided under the Act. The accident occurred in the parking lot used by Saker's customers, employees, and vendors. Petitioner was walking to her car in the parking lot used by Saker when she sustained her injury. Clearly, this parking lot area was under Saker's control.

The causal nexus between the accident and petitioner's employment is manifestly established. We find inconsequential that petitioner, like other employees, chose to park in an area different from the area designated by Saker for employee parking. The nexus to petitioner's employment is more than sufficient here to conclude that the Act provides the exclusive means to compensate her for her injuries. Moreover, petitioner's decision to park close to the supermarket entrance, rather in the remote designated area near the street, was motivated by her reasonable concern for her own safety. See Livingstone, 111 N.J. at 105-06 ("[B]y requiring its employees to park in a distant section of the lot, . . . [the employer] caused its employees to be exposed to an added hazard, on a daily basis").

Petitioner's case shares key similarities to Ramos and Brower. In each case, the accident did not occur during the employee's workday – in Ramos, the

accident occurred before the employee began his workday, 154 N.J. at 588, while in Brower, the employee's accident occurred "after she had punched out on the time clock[,]" 164 N.J. at 370. Most notably, in each case the employer used the location where the accident occurred on a regular basis. Here, Saker regularly used the side lot where petitioner's accident occurred for multiple business purposes, including customer parking, (some) employee parking, deliveries, storing shopping carts, and an area for employees to smoke.

We find largely irrelevant that the landlord was responsible for maintaining the parking areas of the shopping center, as Saker's lease clearly granted Saker, its "customers, invitees, licensees . . . and employees" the right to use the parking areas. While the landlord maintained the parking areas, the lease required Saker to pay "additional rent," reflecting a proportionate share of CAM charges, which included the cost of maintaining parking areas. This type of control did not exist in Hersch, 217 N.J. at 249, the case relied upon by Saker. In Hersch, after the employee parked her car in an employer-provided parking garage, a car struck her as she attempted to cross a public street to get to her office. Ibid. Unlike Hersh, the injury here did not occur on a public street where the employer had no control. Rather, the injury occurred in a parking lot which was used on a daily basis by Saker's customers and employees. Because Saker

12

used and exercised controlled control over the parking lot here, we conclude petitioner's injury is compensable under the premises rule.

In addition, the February 2018 lease amendment clearly expressed the intention to permit Saker to exercise control of the parking lot and do all things necessary to reconfigure and repave the lot. Saker, in fact, completed the work, albeit after the accident. Nevertheless, the execution of the lease amendment ten months before petitioner's accident, reflects Saker's authority to exercise control of the parking lot.

The circumstances of the present case plainly reveal that petitioner never left her employer's premises. We conclude petitioner suffered a compensable injury and is entitled to workers' compensation benefits because she was injured in the course of employment in an employer-controlled parking lot.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2770-19