**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2986-21

JEFFREY BELLO,

    Petitioner-Appellant,

v.

UNITED PANAM
FINANCIAL CORP.,

    Respondent-Respondent.

_____

Submitted February 7, 2024 – Decided March 6, 2024

Before Judges Accurso and Walcott-Henderson.

On appeal from the New Jersey Department of Labor and Workforce Development, Division of Workers' Compensation, Claim Petition Nos. 2018-10081 and 2018-10084.

Jeffrey Bello, appellant pro se.

Lois Law Firm, LLC, attorneys for respondent (Gregory Lois, on the brief).

PER CURIAM

Petitioner Jeffrey Bello appeals from a New Jersey Division of Workers' Compensation order entered on April 19, 2022, following a bifurcated testimonial hearing finding petitioner's alleged injuries were not causally related to his employment with respondent United PanAm Financial Corporation. Petitioner contends the court erred in qualifying respondent's expert witnesses and finding them credible while finding his expert lacked credibility. We disagree and affirm for the reasons stated in Judge R. Louis Gallagher's comprehensive written opinion.

By way of brief background, petitioner filed two claim petitions, 2018-10081 and 2018-10084, seeking medical and temporary workers' compensation benefits from respondent. Petitioner claims he suffered numerous injuries related to exposure to chemical fumes from the air conditioning system in his personal car, which was also being used for work.

Petitioner was hired by respondent in January 2016 as an area sales manager for Philadelphia with the primary responsibility of selling prime auto financing at various car dealerships. He testified that he was required to use his own car—a 2014 Cadillac—for work, but that respondent provided a gas card, a credit card, and GPS-enabled company phones.

2

Approximately three months after petitioner started working for respondent, he had his personal car serviced at Holman Cadillac. Petitioner testified that when he picked up the car, he noticed a "chemical odor in the car, and . . . was concerned." One week later, petitioner turned on the car's air conditioner and "noticed a much stronger chemical odor . . . ." Petitioner testified that he opened the car windows because of the strong odor, and "noticed what felt like a hot pepper on [his] tongue." He then turned off the air conditioner, stopped to see a client, got back into the car, and proceeded to stop at a fast-food restaurant to rinse his mouth.

While in the restaurant, petitioner testified that he was "coughing and spitting up blood." He then called the dealership where the car had been serviced and arranged to drop it off the next day. Later that same evening, petitioner went to the emergency room of a nearby hospital with complaints of eye pain, throat pain, headache, and numerous other symptoms. Hospital records from that evening revealed that petitioner was diagnosed with chemical exposure which was consistent with his complaints to the medical providers. He was advised to rest, drink plenty of fluids, and follow up with his doctor.

The next day, petitioner returned his car to the service department at Holman for inspection and was informed that they could not duplicate the

3 <span>A-2986-21</span>

chemical odor he was complaining about. Petitioner then hired Eagle Industrial Hygiene Associates to test the air quality inside his vehicle. Eagle prepared and released a report indicating it had detected "an aromatic (sweet) chemical type odor" after operating the air conditioning system for over one and a half hours.

Several weeks after Eagle conducted its initial testing, a different Eagle employee authored a second report, which included information based on a safety data sheet provided to him by petitioner "for the product reportedly used for the repair/treatment" of his car. In the report, Eagle noted that the safety data sheet listed several of the product's ingredients as "dangerous components"—specifically: coconut diethanolamide, bis (2-ethylhexyl) phosphate (1:1), and ammonia.[1]

For the next several weeks, petitioner continued to drive his car at various times without using the air conditioner until an especially hot day when he said he had to turn it on. He testified that within a short time of turning on the air conditioner, even with the windows down, he began experiencing severe abdominal pain, burning, and tingling in his mouth. Petitioner went to the

---

[1] The safety data sheet obtained by plaintiff was for the product AirSept cooling coil coating. It is unclear how petitioner concluded this product was used in his car when it was serviced at Holman as there is no evidence in the record to support this conclusion.

A-2986-21

emergency room for a second time with complaints of illness related to chemical exposure and was diagnosed with severe abdominal pain, chemical inhalation, and chemical exposure.

Several weeks later, petitioner purchased a replacement car after GM denied his request to remedy the alleged toxic condition or replace his car. Petitioner testified that he continued to experience "numerous symptoms," including pain in his "left hand, where [his] hand generally rests on the steering wheel," liver pain indicative of "suspected possible fatty liver disease," as well as swelling of breast tissue, memory problems, throat swelling, and lung damage.

Several months later, as a result of petitioner's reported injuries, respondent filed a worker's compensation claim with its insurance carrier on petitioner's behalf. However, petitioner was terminated from his employment with respondent prior to receiving a determination on his worker's compensation claim. In August 2017, respondent's insurance carrier notified petitioner that his claim had been denied. Petitioner subsequently filed the within claim petitions.

Approximately three years after his alleged initial exposure to the chemical odor, petitioner retained Research Triangle Park Laboratories (RTP)

5

to analyze a sample of GM's cooling coil coating—the product petitioner confirmed Holman had used to service his car in 2016.[2] With this report in hand, petitioner retained Eagle to author a third report based in part on the RTP findings.

To prove causation, petitioner retained toxicology expert, Dr. Lawrence Guzzardi. While acknowledging that he spends one-half of his time on toxicology issues in drunk driving defense cases, Dr. Guzzardi also admitted that most of his income was derived from his real estate business, and not the practice of medicine. The doctor had not been not affiliated with any hospital since at least 1996 and was no longer treating patients.[3] Nevertheless, Dr. Guzzardi authored several reports and opined there were "numerous chemicals" identified in the cooling coil coating liquid tested by RTP and that petitioner's injuries were consistent with exposure to high concentrations of those chemicals. Additionally, he concluded that petitioner's reported eye and throat

---

[2] The GM cooling coil coating product was not used in the earlier tests conducted by Eagle. The first report authored by Eagle contained an analysis of a different product, AirSept cooling coil coating. The record is unclear why these products have different names and whether they are in fact the same product.

[3] When asked if he was treating petitioner, Dr. Guzzardi stated, "you can argue yes, you can argue no."

A-2986-21

injuries were consistent with exposure to the chemicals in the cooling coil coating liquid.

Dr. Guzzardi also testified that the chemicals identified in the cooling coil coating liquid have household uses, are routinely found in personal hygiene products, and admitted that he could not opine on the exact levels of any of the chemicals that were present in petitioner's car on the two occasions when he became ill. Furthermore, Dr. Guzzardi's maintained that his conclusions were "partially" based on the limited information provided to him by petitioner, and the RTP and Eagle reports.

Respondent called two experts—Dr. Howard Kipen, a toxicologist who is board-certified in occupational, preventative, and internal medicine, and Dr. Samuel Kahnowitz, a pulmonologist. Neither expert found a causal link between petitioner's extensive complaints and diagnoses and alleged exposure to chemical fumes from his car's air conditioner.

Dr. Kipen testified that he reviewed the RTP and Eagle reports and determined that causation was not evident from petitioner's two alleged incidents of chemical exposure. He also testified there were many different compounds in the products petitioner had tested and in rendering his opinion he "primarily rel[ied] upon the fact that some of them are used commonly in

A-2986-21

cosmetics, in particular the diethycocomide, and that many of the others were present . . . in our environments in trace concentrations as part of our lives." He further addressed the point made by Dr. Guzzardi: that the presence of the smell in petitioner's car was indicative of toxic levels of chemical exposure, stating it is "well established that one can smell things that are odorous . . . at far[,] far lower levels than they are manifested through toxicity."

Dr. Kipen also stated, "the emphasis for [him] was on the short durations of exposure, the necessarily low concentrations, because there was not a major source of [the compounds] that were identified." Dr. Kipen further challenged petitioner's theory of medical causation—that exposure to chemical odors on two occasions in his car could cause petitioner's long list of medical complaints and diagnoses—by pointing out that "many of the important symptoms predated the exposure at issue." In addition, he disputed petitioner's reliance on hospital records as proof that he was exposed to toxic chemicals from his car's air conditioning system because he found that the emergency room personnel relied on petitioner's complaints of chemical exposure, rather than their own independent diagnosis. Ultimately, Dr. Kipen concluded within a reasonable degree of medical certainty that it is highly unlikely for plaintiff to have the numerous diagnoses complained of from two alleged chemical exposures.

A-2986-21

Respondent's second expert, Dr. Kahnowitz examined petitioner and testified based on his examination, as the court later summarized, that he "could not find anything that defined the presence of pulmonary disease." Dr. Kahnowitz stated, "as a pulmonologist, [he] found no specific evidence for actual pulmonary disease, asthma, or anything else . . . ." With respect to whether toxic exposure from inhalation seemed likely in the absence of indicators of lung or airway disease, Dr. Kahnowitz testified, " [n]ot in terms of pulmonary disease, no."

In its thirty-five-page written decision, the workers' compensation judge addressed a total of fifty medical complaints made by petitioner purported to be related to his exposure to chemicals from his personal car's air conditioning system. The court noted that petitioner also has an extensive list of complaints, diagnoses, and medical conditions predating his alleged work-related exposure. The court considered the evidence presented by both parties and began its analysis by addressing the testimony of Dr. Guzzardi, who the court did not find credible, specifically noting petitioner's evidence had little or no weight and

> [a]lthough this court qualified Dr. Guzzardi as an expert in toxicology, his testimony and reports fail to persuade this court on the issue of causation for the following reasons. Dr. Guzzardi relies on hearsay medical reports . . . that parrot what the petitioner tells medical officials. He confuses symptoms for medical

9

diagnosis and [downplays the] amount of chemical exposure and length of time of chemical exposure.

The court found respondent's experts, Dr. Kipen and Dr. Kahnowitz credible and expressly relied on Dr. Kipen's testimony in support of its conclusion that "it is highly unlikely for petitioner to have all these problems from a chemical exposure." The court also relied upon Dr. Kahnowitz's testimony and findings wherein he found petitioner's x-rays did not show the presence of meaningful lung tissue disease.

The court concluded petitioner failed to establish a causal relationship between his work and alleged injuries by a preponderance of the credible evidence on each and every element of his claim. Perez v. Pantasote Inc., 95 N.J. 105, 116-19 (1984). And, it did not believe petitioner's "testimony represent[ed] competent evidence that sustain[s] his complaints."

This appeal followed.

"Our review of decisions from the workers' compensation court is decidedly deferential," Ripp v. Cnty. of Hudson, 472 N.J. Super. 600, 606 (App. Div. 2022), based on the "compensation court's expertise and the valuable opportunity it has had in hearing live testimony." Hager v. M&K Constr., 246 N.J. 1, 18 (2021). Thus, "our review of workers' compensation decisions is 'limited to whether the findings made could have been reached on sufficient

10

credible evidence present in the record.'" Ibid. (quoting Hersh v. Cnty. of Morris, 217 N.J. 236, 242 (2014)).

A trial court's decision as to whether an expert is qualified to testify is entitled to "considerable latitude," and is only reviewed for abuse of discretion. State v. Kuropchak, 221 N.J. 368, 385 (2015). Thus, the decision should only be disturbed on appeal if necessary to prevent "manifest error or injustice." State v. Jenewicz, 193 N.J. 440, 455 (2008). Moreover, a compensation judge is considered to have expertise "with respect to weighing the testimony of competing medical experts and appraising the validity of [a] . . . compensation claim." Ramos v. M F Fashions Inc., 154 N.J. 583, 598 (1998).

Petitioner argues the compensation court erred in dismissing his claim petitions based on the court's qualification of respondent's experts and acceptance of the experts' testimony. With regard to Dr. Kipen, petitioner maintains he held no qualifications or certifications in the field of toxicology and never examined him. Petitioner also asserts both experts offered impermissible net opinions that the court relied on in dismissing his claims. Petitioner finally contests the court's finding that his expert, Dr. Guzzardi, was not credible.

A-2986-21

Respondent highlights the deferential standard of review applicable to our review of workers' compensation matters. It maintains that given the facts of this case, the opportunity of the court to consider the expert testimony, and the deferential standard of review, petitioner has failed to demonstrate that reversal is warranted.

This case required expert testimony to prove a causal link between the alleged exposure to the chemicals and the petitioner's diagnoses. See Pantasote Inc., 95 N.J. at 116. Applying our decidedly deferential standard, we discern no error in the compensation court's qualification of Dr. Kipen as an expert in toxicology and its acceptance of his testimony to conclude "it is highly unlikely for petitioner to have all these problems from a chemical exposure" because of the limited time the body retains these particular substances.

Similarly, we conclude the compensation court's qualification of Dr. Kahnowitz as an expert in pulmonology is entitled to deference, and petitioner has failed to establish any basis to disturb the court's decision. Petitioner acknowledges Dr. Kahnowitz is a pulmonologist but argues he has "no expertise in the study or science of [t]oxicology . . . " and that "[m]ost concerning regarding Dr. Kahnowitz, is the fact that he did not complete or order any respiratory testing of the [p]etitioner . . . ." The compensation court found Dr.

Kahnowitz was an expert and that "after examining petitioner, reviewing his medical history and x-rays [Dr. Kahnowitz] found no specific evidence of actual pulmonary disease, lung disease, and oxygen saturations were normal." Here too, we see no reason to disturb the court's qualification of Dr. Kahnowitz as an expert and its acceptance of the doctor's testimony.

We also disagree with petitioner's contention that respondent's experts offered mere net opinions. "The net opinion rule is a 'corollary of [Rule 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)). Expert opinions must "be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Id. at 53 (quoting Polzo, 196 N.J. at 583). Accordingly, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Crispino v. Township of Sparta, 243 N.J. 234, 257 (2020) (quoting Townsend, 221 N.J. at 54).

Here, Dr. Kipen testified that it is highly unlikely for plaintiff to have these alleged diagnoses from a chemical exposure at the level complained of, and Dr. Kahnowitz offered that "as a pulmonologist, [he] found no specific evidence for actual pulmonary disease, asthma, or anything else . . . ." Both experts testified regarding the why and wherefores in support of their respective conclusions, and we reject petitioner's claims that the experts offered net opinions that should have been disregarded by the court.

We likewise do not disturb the compensation court's decision to discredit the testimony of petitioner's expert, Dr. Guzzardi, after finding that he "relied on unsubstantiated testing reports . . . ," acknowledged that the original cooling coil was mislabeled, and relied upon several reports procured by petitioner that the court found to be incompetent evidence because there was no "chain of custody," and "[t]here was no verification of how the testing was done, [or whether] the testing was done in a reliable manner . . . ."[4] Critically, the court's

---

[4] The court specifically referenced Dr. Guzzardi's reliance on the RTP report and the third Eagle report—the results of which were based on samples provided to RTP by plaintiff, and then forwarded to Eagle and used in its conclusion. The court, citing State v. Chun, 194 N.J. 54 (2008) and State v. Wojtkowiak, 174 174 N.J. Super. 460 (App. Div 1980), noted that the testing performed by RTP was done two years after the alleged incidents and that there was "no chain of custody, reliable testing procedures, testing material presented or the qualification of the person(s) testing."

14

credibility findings with respect to respondent's experts' and their respective opinions are entitled to deference and as our Supreme Court has held, "an appellate court's review of a cold record is no substitute for the [] court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 595 (2020); see also Ramos, 154 N.J. at 598.

Significantly, the court also concluded that petitioner was not a credible witness despite his personal belief that exposure to chemicals released from his car's air conditioning system was the cause of his fifty medical complaints. Having reached that conclusion, the court separately addressed each of petitioner's complaints and diagnoses and determined that he had not met his burden of proof establishing that they were causally related to his alleged exposure to fumes from his car.

Applying the appropriate deferential standard to the workers' compensation court's credibility determinations and conclusions based on the evidence, we discern no basis on which to disturb the court's order and affirm its April 19, 2022 order essentially for the reasons expressed in Judge Gallagher's thorough and well-reasoned written opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2986-21